**NO. 2015-1630**

In The
# United States Court Of Appeals
# For The Federal Circuit

◆

## NETAC TECHNOLOGY CO., LTD.,
*Appellant,*

v.

## SANDISK CORPORATION,
*Appellee,*

**Patent and Trademark Office - Patent Trial and Appeal Board in
Reexamination No. 95/000,384**

---

## BRIEF OF APPELLANT

---

**Xiaoqun Wu**
**ANOVA LAW GROUP, PLLC**
**21351 Gentry Drive**
**Suite 150**
**Sterling, VA  20166**
**(571) 379-9468**

*Dated: July 6, 2015*                    *Counsel for Appellant*

Form 9

FORM 9.  Certificate of Interest

# UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

Netac Technology Co., Ltd. _____ v. SanDisk Corporation _____

No. 15-1630

# CERTIFICATE OF INTEREST

Counsel for the (petitioner) (appellant) (respondent) (appellee) (amicus) (name of party)
Netac Technology Co., Ltd. certifies the following (use "None" if applicable; use extra sheets if necessary):

1.      The full name of every party or amicus represented by me is:

Netac Technology Co., Ltd.

_____

2.      The name of the real party in interest (if the party named in the caption is not the real party in interest) represented by me is:

Netac Technology Co., Ltd.

_____

3.      All parent corporations and any publicly held companies that own 10 percent or more of the stock of the party or amicus curiae represented by me are:

None.

_____

4.  ☑   The names of all law firms and the partners or associates that appeared for the party or amicus now represented by me in the trial court or agency or are expected to appear in this court are:

Sherry Xiaoqun Wu, Anova Law Group, PLLC; Wenye Tan, Anova Law Group, PLLC

_____

| 5/19/2015 | /s/ Xiaoqun Wu |
| Date | Signature of counsel |
| | Xiaoqun Wu |
| | Printed name of counsel |

Please Note: All questions must be answered
cc: Brian W. Oaks; Baker Botts _____

i

# TABLE OF CONTENTS

**Page:**

CERTIFICATE OF INTEREST ................................................................................i

TABLE OF CONTENTS ...................................................................... ii

TABLE OF AUTHORITIES...........................................................v

STATEMENT OF RELATED CASES ............................................... viii

I.   JURISDICTIONAL STATEMENT ...............................................1

II.  STATEMENT OF THE ISSUES ....................................................1

III. STATEMENT OF THE CASE .......................................................2

    A.   Statement of Facts...........................................................2

        1.   Description of the Invention .....................................2

        2.   Summary of claims ................................................7

        3.   Summary of the references .......................................9

            a.   References covering general memory devices: Gupta, Kikuchi, Ban II ....................................9

            b.   References covering USB memory access devices: Ban, Margalit ................................................10

            c.   References covering USB card readers: FujiFilm, RATOC......................................................10

            d.   References covering USB conversion device: Terasaki......................................................11

    e. References covering USB general device: USB 1.1, Sartore ................................................................... 11

    f. Others: Guide, Netac Publication ................................... 11

IV. SUMMARY OF THE ARGUMENT ............................................. 12

V. ARGUMENT ................................................................................ 15

  A. Controlling Legal Principles .............................................. 15

   1. Standard of Review ................................................... 15

   2. The Examiner's Role in Reexamination ................... 16

   3. Principles of Claim Interpretation in Reexamination .............. 17

  B. The Board Erred in Interpreting the Appealed Claims ....................... 18

   1. The Board Erred in Construing the Limitation "directly accessing" in Claim 1 ................................................ 18

   2. The Board Erred in Construing the Limitation "magnetic disk operation format" in Claim 1 ............................................. 21

   3. The Board Erred in Not Construing the Limitation "special read instruction" in Claim 6 and Other Relevant Claims ................................................................... 22

  C. The Board Erred in Finding the Appealed Claims, Properly Construed, Obvious in view of the References ................................... 24

   1. Sartore as the primary reference ............................... 24

   2. Ban as the primary reference .................................... 29

   3. Terasaki as the primary reference ............................. 32

   4. Margalit as the primary reference ............................. 33

D.    The Patent Office Failed to Perform Sufficient Fact-finding to Support the Rejections with Substantial Evidence ..............................35

    1.    The Patent Office Failed to Perform Fact-findings for Making the Obviousness Rejections.........................................35

    2.    The Examiner Failed to Consider Netac Technology's Declarations and Related Documents ......................................36

    3.    The Patent Office's Failure to Allow Netac Technology to Submit Rebuttal Evidence is Prejudicial ..............................40

    4.    The Examiner Failed to Determine Publication Dates of Multiple Applied References ....................................................41

VI.    CONCLUSION AND STATEMENT OF RELIEF SOUGHT.....................42

VII.    REQUEST FOR ORAL ARGUMENT.........................................................43

ADDENDUM

CERTIFICATE OF FILING AND SERVICE

CERTIFICATE OF COMPLIANCE

# TABLE OF AUTHORITIES

**Page(s):**

**Cases:**

*Coleman v. Dines*,
  754 F.2d 353 (Fed. Cir. 1985) ....................................................38

*Dickinson v. Zurko*,
  527 U.S. 150 (1999)..................................................................16

*In re Baker Hughes, Inc.*,
  215 F.3d 1297 (Fed. Cir. 2000) ................................................15

*In re Baxter Intern., Inc.*,
  678 F.3d 1357 (Fed. Cir. 2012) ................................................15

*In re Cortright*,
  165 F.3d 1353 (Fed. Cir. 1999) ................................................17

*In re ICON Health and Fitness, Inc.*,
  496 F.3d 1374 (Fed. Cir. 2007) ................................................17

*In re International Flavors & Fragrances, Inc.*,
  183 F.3d 1361 (Fed. Cir. 1999) ................................................16

*In re Morris*,
  127 F.3d 1048 (Fed. Cir. 1997) ................................................17

*In re NTP, Inc.*,
  654 F.3d 1268 (Fed. Cir. 2011) ................................................15

*In re Suitco Surface, Inc.*,
  603 F.3d 1255 (Fed. Cir. 2010) ..........................................16, 17

*KSR International Co. v. Teleflex Inc.*,
  550 U.S. 398 (2007)..................................................................35

*Mahurkarv. C.R. Bard, Inc.*,
  79 F.3d 1572 (Fed. Cir. 1996) ................................................38

*Medrad, Inc. v. MRI Devices Corp.*,
    401 F.3d 1313 (Fed. Cir. 2005) ....................................................17

*Microsoft Corp. v. Proxyconn, Inc.*,
    2014-1542 - 1543, Slip op. (Fed. Cir. June 16, 2015) ...................17

*Phillips v. AWH Corp.*,
    415 F.3d 1303 (Fed. Cir. 2005) ....................................................17

*Price v. Symsek*,
    988 F.2d 1187 (Fed. Cir. 1996) ....................................................38

*Spansion, Inc. v. Int'l Trade Comm'n*,
    629 F.3d 1331 (Fed. Cir. 2010) ....................................................38

**Statutes:**

5 U.S.C. § 706(2)(a) .............................................................................16

28 U.S.C. § 1295(a)(4)(A) ......................................................................1

35 U.S.C. § 103 ..............................................................................14, 35

35 U.S.C. § 104(a)(1).........................................................................39

35 U.S.C. § 134(b) ................................................................................1

35 U.S.C. § 141 .....................................................................................1

35 U.S.C. § 142 .....................................................................................1

35 U.S.C. § 315(a) .................................................................................1

M.P.E.P. § 2128 .................................................................................41

M.P.E.P. § 2141(II) ............................................................................35

M.P.E.P. § 2141(III)............................................................................35

**Regulation:**

37 C.F.R. § 1.104(a)(1) ........................................................................16

**Rule:**

Fed. Cir. R. 15(a) .............................................................................1

## STATEMENT OF RELATED CASES

This appeal involves U.S. Patent No. 6,829,672 ("the '672 patent"). The '672 patent is parent of a later-filed continuation U.S. Patent No. 7,788,447 ("the '447 patent"). The '447 patent is the subject of *Inter Partes* Reexamination No. 95/001,747 ("the '747 reexamination") filed by the same Third-party Requester SanDisk on September 7, 2011. The '747 reexamination is currently under appeal before the Patent Trial and Appeal Board.

In addition, the '672 patent was the subject of a previous litigation case, captioned *Netac Technology Co., Ltd. v. PNY Technologies, Inc.*, Civil Action No. 5:06-cv-00029-TJW (E.D. Tex.), which was filed on February 10, 2006. That case settled and was dismissed by joint agreement of the parties on February 25, 2008. The district court issued a Memorandum Opinion and Order regarding claim construction on December 13, 2007.

# I.    JURISDICTIONAL STATEMENT

This Court has appellate jurisdiction pursuant to 28 U.S.C. § 1295(a)(4)(A) and 35 U.S.C. § 141 to review this appeal from a final adverse decision of the Patent Trial and Appeal Board ("Board") of the United States Patent and Trademark Office ("Patent Office") in an *inter partes* patent reexamination proceeding. The Board had subject matter jurisdiction pursuant to 35 U.S.C. §§ 134(b) and 315(a) over the patent owner's appeal from a final rejection in the reexamination proceeding. The Board rendered its final decision ("Decision") on December 31, 2013 (A1) and its decision on request for rehearing ("Rehearing Decision") on January 27, 2015 (A45) and this appeal was timely filed on March 23, 2015 (A4157) pursuant to 35 U.S.C. § 142 and Federal Circuit Rule 15(a).

# II.    STATEMENT OF THE ISSUES

1.   Whether the Board erred on its claim construction regarding the claimed limitations "directly accessing"

2.   Whether the Board erred on its claim construction regarding the claimed limitations "magnetic disk operation format."

3.   Whether the Board erred on its claim construction or lack thereof regarding the claimed limitations "special read instruction."

4.   Whether the Board erred in finding the appealed claims, properly construed, obvious in view of the References.

5.   Whether the Patent Office failed to perform sufficient fact-finding to support the rejections in the Board's Decision with substantial evidence.

## III.    STATEMENT OF THE CASE

This appeal stems from a request filed by Third-Party/Appellee SanDisk Corporation ("SanDisk") on July 9, 2008 for *inter partes* reexamination of U.S. Patent No. 6,829,672 ("the '672 patent"), owned by Appellant/Patent Owner Netac Technology Co., Ltd. ("Netac Technology"). The reexamination request was granted on October 17, 2008 (Control No. 95/000,384). A506.

On November 3, 2008, the Examiner issued a first Office Action. A540. On January 13, 2010, the Examiner issued an Action Closing Prosecution rejecting all claims (1-22) of the '672 patent. A1828. On September 7, 2010, the Examiner issued a Right of Appeal Notice ("RAN"). A1935. Netac Technology timely appealed the Examiner's rejections, including the rejections presently appealed, to the Board. A1971. On December 31, 2013, the Board affirmed all rejections. A1. On January 27, 2015, the Board denied Netac Technology's Request for Rehearing. A45. On March 23, 2015, Netac Technology timely appealed the Board's Decision to the Federal Circuit. A4157.

### A.    Statement of Facts

#### 1.    Description of the Invention

The '672 patent provides a new kind of portable storage device to solve the portability and convenience issues in prior art portable computer storage devices. At that time frame, Netac Technology was among those first to develop such kind

2

of USB (Universal System Bus) flash drives, which became staple storage items in today's world.

This new kind of portable storage device is a single-piece USB storage device that can replace prior art floppy disk drives and other physical drives, which require two separate devices to be operational, a physical drive connected with a host computer and a storage device (e.g., a floppy disk) to be inserted into the physical drive for data access. A60 at 1:47-57.



As shown in the Figure 1 of the '672 patent, reproduced above, the claimed external storage device uses flash memory as storage media, and all components and PCB (printed circuit board) used are assembled as a monolithic piece. The external storage device uses software to implement external storage functions and, thus, every part is physically at a standstill during the process of access. A60 at 2:29-35.

3

In operation, the external storage device is simply plugged into a USB port of a host computer or any other data processing host. Power for the external storage device is provided only by the host via a USB bus, and a data exchange channel is establish for the host computer and the external storage device to exchange data or information in accordance with the USB standard. A62 at 6:28-39.



*Fig.5*

As shown in Figure 5 of the '672 patent, reproduced above, there are two major software components for the external storage device to function, one is a driver installed on the host computer, called the flash electronic memory external storage driver, and the other is a firmware located on the storage device, called flash electronic memory external firmware.

4

The driver on the host computer and the firmware on the external storage device, together with the operating system on the host computer, implements the removable flash drive structure. When the external storage device is plugged in the host computer, the driver can cause the host computer to automatically assigned a drive symbol and to display the created drive symbol and, conveniently, can allow the user to access the external storage device using magnetic disk operation format, which is interpreted and converted by the driver for data exchange with the external storage device over the USB bus. *See* A64 at 9:26-41.

Because the driver is located between the upper layer of operating system and lower layer operating system, the data exchange method between the host and the external storage device (*i.e.*, between the driver and the firmware) is the standard method defined by the universal bus specifications. The driver and firmware packages and un-packages data according to the standard USB protocol before the data is transferred from driver to firmware or from firmware to driver without any additional data conversion, *i.e.*, a direct access. A62 at 6:28-35. That is, the USB provides a data exchange channel between the driver and the external storage device for direct exchange of data and information for operation of the external storage device. More details of the operation are shown in Figure 7 of the '672 patent, reproduced below.



Plug into

Initialization.    S1

Notify the operating system to assign an external storage driver.    S2

Waiting for the operation request.    S3

Operate the magnetic disk?    S4

Yes

S5    Specifical operation for converting magnetic disk operation into electronic flash memory external storage device.

S6    Specifically operate electronic flash memory external storage device to package it in the format defined by USB.

S7    Send the packaged operation to the firmware via the operation system and wait for operation return.

S8    Return Process information of result or state etc.

No

Plug-and-play or other supportable operation?    S9    No

Yes

processing operation.    S10

Return Process information of result or state etc.    S11

Pull out

Notify the operating system to remove the movable storage device.    S12

**FIG. 7**

As shown in Figure 7 (and also referring to Figure 5), upon the storage device is plugged into the data processing host, the driver coordinates with

6

firmware to initialize the device and assign and display a device symbol for the storage device via the operating system of the host computer. Then, the driver processes user operation requests in magnetic disk operation format that are sent from the operating system to the external storage device. That is, the driver converts the magnetic disk operation into a special format over USB for execution by the firmware, *i.e.*, a special operation instruction. The firmware receives the special operation instruction over USB and un-packages the special operation to perform corresponding data accessing operation on the storage device and sends the results back to the driver. A64 at 9:54-10:4.

## 2.    Summary of claims

The '672 patent has a total of 22 claims, with claims 1 and 19-22 as independent claims. Because claims 19-22 contain combinations of claim limitations from claim 1 and dependent claims 6-10, only independent claim 1 and dependent claim 6 are used as representative claims in this appeal.

Claims 1 and 6 recite various above-described features to provide a removable USB flash disk drive as a portable and convenient external data storage solution for computer systems and other data processing hosts.

1. An electronic flash memory external storage method, comprising the steps of:

establishing data exchange channel between a data processing system and a portable external storage device based on USB or IEEE1394 bus upon plug

7

said portable external storage device into said USB or IEEE 1394 bus interface of said data processing system;

acquiring a DC power supply from said data processing system for said external storage device through said USB or IEEE1394 bus upon plug said portable external storage device into said USB or IEEE 1394 bus interface;

configuring a flash memory storage module built-in said external storage device, wherein the data storage structure of the flash memory storage module is arranged on a block basis;

directly accessing data or information in the said flash memory storage module based on USB or IEEE1394 bus standard through said established data exchange channel by implementing and processing the data access operation requests issued by users,

wherein said data processing system assigning and displaying a device symbol for said external storage device and processing the operation request in magnetic disk operation format issued from users upon plug said external storage device into said USB or IEEE 1394 interface of said data processing system.

6. The external storage method according to claim 1, wherein a read operation comprising steps:

upper layer operating system receives the read command from user, wherein the command format is the conventional magnetic disk operation format; upper layer operating system sends said read command to the driver;

the driver converts the read command into special read instruction which can be understood and executed by the firmware, and packages the converted read instruction based on USB or IEEE1394 bus standard, then transfers said packaged read instruction to bottom layer operation;

bottom layer operating system sends said packaged read instruction based on USB or IEEE1394 bus standard to the firmware through an access control circuit of USB or IEEE1394 bus in the external storage device; and

said firmware executes said converted read instruction, and transfers results and status back to the driver through operating system.

### 3.    Summary of the references

In its request for reexamination, SanDisk applied a total of twelve (12) references. None of the twelve references was used to challenge the novelty of the '672 patent, *i.e.*, none of these references have the concept of USB flash disk drive as claimed in the '672 patent. SanDisk combined these twelve references in 52 different combinations, sometimes as many as 5 references in a single combination, for allegedly teaching the claimed invention. *See* A6-A11. These references are summarized below into different categories for easy understanding.

### a.    References covering general memory devices: Gupta, Kikuchi, Ban II

These references disclose certain memory devices without disclosing any relationship to USB. Gupta discloses a "flash memory array architecture . . . which has several operating modes which permit data to be read from the flash memory array, several operating modes which permit data to be programmed into the flash memory array, and a mode for rewriting data in the flash memory array." A2733 at Abstract. Kikuchi discloses "to provide a flash memory card which can reliably retain stored data by preventing an undesired write operation." A2755 at ll. 1-3. Ban II discloses a flash memory emulating random access memory to allow "existing computer operating systems to provide all other required support in the same manner provided by standard random access memories." A2720 at 1:58-62.

### b.    References covering USB memory access devices: Ban, Margalit

These references disclose certain devices using USB to access memory at a lower level for their advantages, without disclosing higher level application implementations. Thus, unlike the '672 patent, these simple USB memory access devices are not at the disk level. Ban discloses a "storage unit made of flash array and a USB controller, [which] is implemented to be compatible with the USB specification," *i.e.*, a USB memory device. A2100 at Abstract. Margalit discloses a USB memory device to be used with a host computer such that the host computer can write/read data to/from the memory device through the USB protocol. *See* A2134 at 3:5-13.

### c.    References covering USB card readers: FujiFilm, RATOC

These references disclose USB card readers which, like floppy disks, require a separate physical drive and a storage media to be inserted into the drive. Such separate drive and disk structure is discussed in the background of the '672 patent as an issue to be overcome. Both FujiFilm and RATOC disclose memory card readers using USB to connect to a host computer. These USB card readers also operate like floppy disks, the drive needs to be connected to the host computer and installed first, and then the storage media can be inserted into the drive for data

access. *See* A2146-A2148; A2221; A2237. Further, both FujiFilm and RATOC are user manuals, not many implementation details are disclosed. A2137; A2209.

### d.     References covering USB conversion device: Terasaki

This reference discloses the kind of device that is actually designed for standards different than USB and, thus, require a USB conversion to be operational. Terasaki discloses a storage device having two interfaces, the first interface is a PCMCIA ATA interface, and the second interface is a USB interface and an IDE interface, and data access to the storage device from a host computer can be through the USB and IDE, *i.e.*, USB-IDE conversion. A2127 at 13:18-34.

### e.     References covering USB general device: USB 1.1, Sartore

These references just describe USB devices in general. USB1.1 is the official specification of the USB standard. A2275. Sartore discloses a USB peripheral device with a memory to be programmed with configuration information by a host to reconfigure the peripheral device. *See* A2812 at 2:31-47.

### f.     Others: Guide, Netac Publication

Guide is a guide to Windows 98 operating system, teaching the user how to use the Windows 98 operating system. One feature is called "Drag-and-Drop," a technique to move files around different directories conveniently. To drag and drop an object (file), a user first needs to open the Windows Explorer software application; the user then drags an object into a destination drive/directory, the

11

Windows Explorer can create a short-cut for the object if that object is executable. *See* A2684; Figure 6.2. Guide also discusses a plug-and-play BIOS (basic input output system) that uses a power-on self test code to enumerate all the plug-and-play compliant devices installed on the system and interrogate each device to determine its resource requirements. A2709.

Netac Publication (Netac) is a short published advertisement of an "ONLY DISC" product by Netac Technology. Being an advertisement, other than claiming that "the ONLY DISC can be used just like using the common floppy or hard disk" after "the system automatically generates a removable disc," this reference does not disclose any detail how such removable disc is generated and how data is accessed, etc. A2719.

## IV.    SUMMARY OF THE ARGUMENT

This appeal involves basic questions of claim construction. There was no claim interpretation in the first Office Action, other than incorporating claim charts from SanDisk. Later, parties disputed on claim terms of many claims, including both independent claims and dependent claims. In this appeal, for the sake of clarity, Netac Technology only presents three representative claim terms in dispute.

First, for claimed limitations "directly accessing data or information in the said flash memory storage module based on USB or IEEE1394 bus standard through said established data exchange channel by implementing and processing

the data access operation requests issued by users" in claim 1, the term "directly accessing" should mean "accessing without communication protocol conversion." A3687; A646. Alternatively, Netac Technology also proposed to follow the claim construction of "communicating with the flash memory storage module using USB or IEEE bus protocol without a communication protocol conversion such as a USB to ATA conversion" as construed by the district court of the Eastern District of Texas. A657. SanDisk (and the Examiner) alleged that "directly accessing" should simply mean "accessing", rendering the term "directly" without any meaning. A1740.

The Board, however, has a completely different construction, allegedly consistent with the "broadest reasonable interpretation" standard, in which the term "directly accessing" is construed as "firmware directly controlling access of flash memory." A39. This construction is erroneous.

Second, also in claim 1, for the claimed limitations "processing the operation request in magnetic disk operation format issued from users upon plug said external storage device into said USB or IEEE 1394 interface of said data processing system," the term "magnetic disk operation format" should be construed as its plain meaning, *i.e.*, "an operation format of a magnetic disk." A644. SanDisk construed this term as operation format of "a disk drive." A1733.

13

The Board did not address this dispute. SanDisk's claim construction, however, is erroneous.

Third, for claimed limitations "the driver converts the read command into special read instruction which can be understood and executed by the firmware" in claim 6, the term "special read instruction" should mean "a converted read command" or "a read instruction in a format different from the read command." A656; A3682; A3097-3098. SanDisk (and the Examiner) did not construe this term. A1722-1723. The Board discussed the limitations briefly without construing the terms. A34. Here, Netac Technology's claim construction should be adopted.

Moreover, equally important, there were many factual issues still unresolved in this *inter partes* reexamination.[1] Over the entire course of the reexamination, the Examiner failed to make the Graham factual inquiries required for making Section 103 rejections, failed to follow proper standard in making Section 103 rejections, failed to consider numerous Netac Technology's declarations and related documents, failed to offer Netac Technology a fair chance to rebut character allegations against it, and failed to determine the qualification of multiple applied references as prior art, etc. There was little independent action from the Examiner

---

[1] With a total of 12 references and 52 grounds of obviousness rejections under 35 U.S.C. § 103, many of which are repetitive, it appears that the Examiner was overwhelmed from the start.

14

other than agreeing and incorporating SanDisk's allegations and assertions without reasoning.

The Board did not remand the reexamination back to the Examiner. Instead, the Board issued the Decision. The Decision did not address all grounds of rejections, and referred to SanDisk's Respondent Brief to be included in the Decision, making it difficult to understand what the final ruling from the Board was. The Board subsequently denied Netac Technology's request for rehearing to address new grounds raised by the Board and facts overlooked by the Board.

The Examiner's failures, together with the Board's inaction, not only made the final rejections arbitrary and unsupported by substantial evidence, but also deprived Netac Technology a fair *inter partes* reexamination proceeding.

## V.    ARGUMENT

### A.    Controlling Legal Principles

#### 1.    Standard of Review

The Patent Office's claim constructions and interpretations are questions of law that the Federal Circuit reviews de novo and without deference. *In re Baxter Intern., Inc.*, 678 F.3d 1357, 1362 (Fed. Cir. 2012); *In re NTP, Inc.*, 654 F.3d 1268, 1274 (Fed. Cir. 2011) (citing *In re Baker Hughes, Inc.*, 215 F.3d 1297, 1301 (Fed. Cir. 2000)).

On the other hand, the Patent Office's factual finding including its obviousness ruling is reviewed under the substantial evidence standard set forth in

the Administrative Procedure Act. *See Dickinson v. Zurko*, 527 U.S. 150, 152 (1999). *See also In re Suitco Surface, Inc.*, 603 F.3d 1255, 1259 (Fed. Cir. 2010). "'Substantial evidence is something less than the weight of the evidence but more than a mere scintilla of evidence,' ... and 'means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *In re Suitco Surface, Inc.*, 603 F.3d 1255, 1259 (Fed. Cir. 2010) (citations omitted). Thus, if the Board's factual determinations are unsupported by substantial evidence or are otherwise arbitrary, capricious, or constitute an abuse of discretion, they must be set aside. *See* 5 U.S.C. § 706(2)(a) (1994); *In re International Flavors & Fragrances, Inc.*, 183 F.3d 1361, 1365 (Fed. Cir. 1999).

## 2.     The Examiner's Role in Reexamination

The Patent Office explicitly mandates its Examiners in the reexamination to perform complete fact-finding independently and to apply proper patent laws. The Examiner's action must comply at least with 37 C.F.R. § 1.104(a)(1), as follows.

> On taking up an application for examination or a patent in a reexamination proceeding, the examiner shall make a thorough study thereof and shall make a thorough investigation of the available prior art relating to the subject matter of the claimed invention. The examination shall be complete with respect both to compliance of the application or patent under reexamination with the applicable statutes and rules and to the patentability of the invention as claimed, as well as with respect to matters of form, unless otherwise indicated.

### 3.      Principles of Claim Interpretation in Reexamination

During reexamination, claims must be given their broadest reasonable construction consistent with the specification. *In re ICON Health and Fitness, Inc.*, 496 F.3d 1374, 1379 (Fed. Cir. 2007). *See also Medrad, Inc. v. MRI Devices Corp.*, 401 F.3d 1313, 1319 (Fed. Cir. 2005) ("We cannot look at the ordinary meaning of the term … in a vacuum. Rather, we must look at the ordinary meaning in the context of the written description and the prosecution history."). The broadest reasonable interpretation of the claims must also be consistent with the interpretation that those skilled in the art would reach. *In re Cortright*, 165 F.3d 1353, 1358 (Fed. Cir. 1999). Thus, the Federal Circuit reviews the Board's interpretation of disputed claim language to determine whether it is "reasonable" in light of all the evidence before the Board. *In re Suitco Surface, Inc.*, 603 F.3d 1255, 1259 (Fed. Cir. 2010) (citing *In re Morris*, 127 F.3d 1048, 1055 (Fed. Cir. 1997)).

This Court recently clarified that the Patent Office cannot construe claims so broadly that its constructions are unreasonable under general claim construction principles. *See Microsoft Corp. v. Proxyconn, Inc.*, 2014-1542 – 1543, Slip op. at 6-7 (Fed. Cir. June 16, 2015). The Court also illustrated general claim construction principles in *Phillips v. AWH Corp.*, 415 F.3d 1303 (Fed. Cir. 2005) (en banc).

**B.    The Board Erred in Interpreting the Appealed Claims**

The dispositive issue in this appeal is the proper interpretation of the following limitations of independent claim 1 and its dependent claim 6 when construed in light of the overall contexts of the claims and the specification:

### 1.    The Board Erred in Construing the Limitation "directly accessing" in Claim 1

The term "directly accessing" is in the following limitations of claim 1:

> directly accessing data or information in the said flash memory storage module based on USB or IEEE1394 bus standard through said established data exchange channel by implementing and processing the data access operation requests issued by users

Netac Technology construed the term "directly accessing" to mean "accessing without communication protocol conversion." A3687; A646. Netac Technology also construed the term "directly accessing" to mean "communicating with the flash memory storage module using USB or IEEE bus protocol without a communication protocol conversion such as a USB to ATA conversion," as construed by the district court of the Eastern District of Texas. A657.

SanDisk construed this term to mean just "accessing," *i.e.*, "the plain language of the 'directly accessing' limitation merely requires data in the flash memory be accessed by the host through the already-established data channel." A3759. This construction ignores the word "directly" completely.

Netac Technology's construction is consistent with and required by the specification of the '672 patent. The prosecution history of the '672 patent supports such construction. *See* A3092-A3094. Further, the specification explicitly describes the accessing operation of the storage device:

> When upper layer operating system receives a read command, it passes the read command to the driver. . . . the driver again packages the converted instruction into USB packets, and sends the packaged read instruction to bottom layer operating system. The bottom layer operating system in turn sends the read instruction through the USB interface to the firmware running in the microprocessor of the electronic flash memory external storage device. The firmware executes the read instruction and sends the read data and status back to the driver

A64 at 9:54-10:1. It is clear that the driver on the host exchanges data with the firmware on the storage device directly over the USB interface, without any other intermediate communication protocol. Any other construction, *i.e.*, allowing other intermediate bus protocols, not only defeats the purpose of the claimed invention of a portable USB flash disk, but also is unsupported by the specification. This can be further confirmed by the specification:

> When the data processing system requests to read data, the USB interface controller chip D2 notifies the microprocessor chip D4. According to the request of the operation system, the microprocessor chip D4 reads the requested data from the flash memory D1, and sends the data back to the chip D2. The chip D2 in turn sends the requested data back to the data processing system.

19

*Id.* at 10:5-11. That is, the firmware (on the microprocessor chip D4) directly interfaces with the USB interface for data access, without any intermediate processing. Thus, Netac Technology's claim construction should be adopted.

The Board, however, disagreed with any existing construction and proffered its own construction, which construed the term "directly accessing" to mean "**firmware 'directly' controlling access of flash memory**." A39.

The Board indicated that such construction is supported by the specification at col. 4:27-30 and col. 10:67-11:3. *Id.* These portions are reproduced as follows:

> Said storage method also includes a firmware that resides in the electronic flash memory external device and directly controls the access of flash memory and implements standard interface functions. (col. 4:27-30)

> The micro-controller directly controls the access to the storage media of the device and includes firmware that implements standard functions. (col. 10:67-11:3)

The Board's construction is erroneous for several reasons. First, the term in dispute is "directly accessing", and the Board's construction is "directly controlling accessing." Even under plain meaning, controlling access (which only deal with control) and accessing (which deal with data and control) are two different things.

Second, the limitation as a whole does not support the "controlling access" construction. It is clear that "directly accessing data or information . . . through said established data exchange channel by implementing and processing the data access operation requests issued by users" is for data access and not for controlling

20

access. In other words, this limitation is about data access not about controlling access.

Third, most importantly, this step "directly accessing data . . . in the said flash memory storage module based on USB or IEEE1394 bus standard through said established data exchange channel" is performed by the driver on the host, not by the firmware on the storage device. *See* A56 FIG. 5. Thus, the firmware is not involved in this step and cannot perform this limitation. The Board's construction of "firmware controlling accessing" is thus clearly erroneous.

### 2.    The Board Erred in Construing the Limitation "magnetic disk operation format" in Claim 1

Netac Technology indicated that the term "magnetic disk operation format" should have its plain meaning, *i.e.*, "an operation format of a magnetic disk," as a magnetic disk requires a physical drive to move a read/write head to a particular location to access the data at that location. A644. In other words, a traditional magnetic disk format. A3646.

SanDisk construed this term as operation format of a disk drive. A1733. The Board agreed with SanDisk.

Neither SanDisk nor the Board identified any portion of the specification supporting such construction. A disk drive can be many types of drives, not every disk drive is a magnetic disk. Thus, the term "magnetic disk operation format" should be just given its plain meaning.

21

Such plain meaning construction is also consistent with the specification, as the specification uses the magnetic disk operation format intentionally. "At present, the operation request is mainly in magnetic disk operation format. It needs to be converted by the driver into special operation instruction for the external storage device." A61 at 4:54-57. Thus, Netac Technology's claim construction should be adopted.

### 3.    The Board Erred in Not Construing the Limitation "special read instruction" in Claim 6 and Other Relevant Claims

Netac Technology construed the term "special read instruction" in claim 6 as a read instruction "converted from the read command in conventional disk operation format." A656; A3682. Neither SanDisk nor the Board proposed any alternative claim construction but, nevertheless, both of SanDisk and the Board disagreed with such a construction.

The relevant limitations from claim 6 are as follows:

> upper layer operating system receives the read command from user, wherein the command format is the conventional magnetic disk operation format; upper layer operating system sends said read command to the driver;

> the driver converts the read command into special read instruction which can be understood and executed by the firmware, and packages the converted read instruction based on USB or IEEE1394 bus standard, then transfers said packaged read instruction to bottom layer operation . . .

The claim language itself is clear about the meaning of the term "special read instruction." The claim language defines the "special read instruction" as being converted from the read command, and the read command being the conventional magnetic disk operation format. Thus, the special read instruction is a read instruction converted from the read command in conventional disk operation format.

The specification is also consistent with such construction, and there are several places mentioning the special operation instruction (for read and write).

> . . . At present, the operation request is mainly in magnetic disk operation format. It needs to be converted by the driver into special operation instruction for the external storage device

672 Col. 4:54-57; and

> When upper layer operating system receives a read command, it passes the read command to the driver. Because the format of the read command is the standard magnetic disk operation format which is different from the operation format of USB and flash memory, the driver converts the read command into the special instruction for the electronic flash memory external storage device. After the conversion, the driver again packages the converted instruction into USB packets, and sends the packaged read instruction to bottom layer operating system . . .

Col. 9:54-63. The specification indeed matches the claim language.

The read command is a magnetic disk operation format from a user request. Because the firmware is a flash memory storage device, by its nature, the operation format for the firmware is different from the read command. Thus, such read

23

command is processed by the driver to be converted into read instructions that can be understood by the firmware.

Thus, under the broadest reasonable interpretation rule, the term should be construed as what Netac Technology proposed. In addition, Netac Technology's construction should be adopted because the Board failed to provide its own claim construction.

### C. The Board Erred in Finding the Appealed Claims, Properly Construed, Obvious in view of the References

Claims 1 and 6 are discussed as representative claims against each primary reference and its secondary references, and other claims are either dependent claims or are similarly allowable.

#### 1. Sartore as the primary reference

Sartore is the only reference used by the Board against the appeal claims, particularly representative claim 1, in its decision.[2] A12-A21.

The Board recognized that Sartore discloses a USB peripheral device and the memory on the peripheral device is used to contain configuration information downloaded to the peripheral device by the host computer. A13-A14.

In computer terms, a peripheral device is an input/output device connected to computer, such as "a modem, a printer, a keyboard and a mouse." A2812 at

---

[2] SanDisk used almost identical references but dropped the Sartore reference in the related *inter partes* reexamination 95/001,747.

1:16-17. In other words, a peripheral device is not a storage device. Even assuming Sartore's peripheral device can be stretched to include storage devices, which Netac Technology disagrees, the disclosure of Sartore does not support SanDisk's alleged teaching, nor is there any rationale to combine Sartore with other secondary references, as explained below.



FIG. 2

As shown in above reproduced FIG. 2, Sartore discloses a system and method for reconfiguring a USB peripheral device. "The host computer may

25

include a CPU 62, a memory 64, an operating system 65 and a USB interface circuit 66." A2813 at 4:56-58. "The peripheral device 54 may include a USB interface system 71 . . . which may include an alterable memory 74 . . . [that] may initially contain an identification code to indicate which configuration information set should be downloaded to the peripheral device." A2813 at 5:7-14.

> . . . when the peripheral device is first connected to the USB, the configuration information 70, including any microprocessor code applicable to the peripheral device and the appropriate configuration data for the peripheral device may be **downloaded** over the USB into the memory 74 of the peripheral device 54 as shown by **the dashed arrow 78**. . . . During the re-enumeration process, the newly downloaded configuration information may be used to reconfigure the USB for the peripheral device and the host computer may select the appropriate software device driver 68 for the peripheral device based on the configuration information.

A2813 at 5:37-51 (emphases added).

That is, whenever the USB peripheral device is connected (or reconnected) with the host, the configuration data is downloaded by the host to the memory 74 of the USB peripheral device for USB configuration processing. In other words, the memory 74 in Sartore is not used for general storage, such as disk storage. Rather, the memory 74 is programmed or set by the host during the connection time for providing USB configuration information. In fact, Sartore never intends to store information on the peripheral device:

> The invention provides a universal serial bus interface system and method in which the configuration information for a plurality of different peripheral devices may be stored in the host computer rather

than in the peripheral devices themselves. The flexibility of the universal serial bus is thereby increased because each **peripheral device does not need to store** configuration information.

Col. 2:32-38 (emphasis added).

Thus, Sartore actually suggests against storing any information on the USB peripheral device, much less providing any storage device based on USB. In fact, Sartore does not mention anything related to disk drive, or anything related to magnetic disk operation. The Board did not provide any rationale on combining an unrelated teaching from Sartore with other secondary references for teaching all the limitations of appealed claims. Indeed, the memory disclosed by Sartore is merely a place holding configuration information of the peripheral device itself for USB initialization, and never was intended or even practical to implement any disk drive storage.

Further, equally important, the dashed arrow 78 in FIG. 2 of Sartore is a single-direction arrow, means that only the host downloads data to the memory 74 of the peripheral device through the USB interface, *i.e.*, a *one-way* operation. As such, there can be no "establishing data **exchange** channel between a data processing system and a portable external storage device" in Sartore.

Thus, Sartore fails to teach the "data exchange channel" feature, and Sartore also fails to teach at least the "magnetic disk operation format" feature of claim 1 or the "special read instruction" feature of claim 6.

27

SanDisk combined secondary references Ban II and Gupta with Sartore. However, in addition to SanDisk's failure to articulate rationale for such combination, Ban II and Gupta also fail to teach above discussed features.

Ban II discloses "a flash memory, virtual mapping system that allows data to be continuously written to unwritten physical address locations." A2721 at Abstract. Ban II disclosed providing flash memory that "emulates a random access memory, such as a disk memory, and the processor operating system software provides all other required operating support (such as a file system) in the same manner as it provides for a standard random access memory." A2728 at 3:66-4:4.

Thus, Ban II merely discloses how to use flash memory to emulate random access memory (RAM) to provide random access to memory block. However, block memory access does not require magnetic disk. *See* A644. In fact, a block device can be many types of devices. Ban II does not disclose anything on magnetic disk drive or on magnetic disk operation.

Similarly, Gupta just discloses various operation modes of flash memory, and simply cannot teach the limitations such as "the driver converts the read command into **special read instruction** which can be understood and executed by the firmware" of claim 6.

## 2. Ban as the primary reference

Ban discloses a "storage unit made of flash array and a USB controller, [which] is implemented to be compatible with the USB specification," *i.e.*, a USB memory device. A2101 at Abstract. In other words, Ban discloses a USB memory device providing device-level storage functions, *i.e.*, a flash memory module through the USB bus.

More specifically, Ban defines an architecture and protocols between the host and the USB memory module for memory or device-level access. *See*, *e.g.*, A2111 at 6:41-67. At a high level, the difference between Ban and Netac Technology's claimed invention is that the claimed invention includes a disk driver portion and a firmware portion to implement a USB removable disk drive, while Ban only includes a device driver and a firmware (called MTD) to implement a USB memory device.

This difference is clearly indicated in Ban's specification. For example, Ban does not intend the host platform to assign and display a device symbol for the device. "Whenever USB flash device 46 becomes connected to host platform 44, a **standard USB enumeration process** takes place." A2111 at 6:28-30. "When the USB flash device is first connected to the host platform, the USB host controller assigns an address to the USB flash device on the USB bus." A2112 at 8:53-56.

Thus, indeed, it is Ban's intention to provide such a general-purpose lower-level device such that other applications can be built on top of it. Ban explains:

> Using the above described protocol and architecture, host platform 44 can optionally implement any application which is implementable **with any regular memory mapped or I/O mapped flash memory device**. For example, host platform 44 can give a standard block device interface to each application, such as a magnetic storage medium "hard disk" drive, as disclosed in the previously described U.S. Pat. No. 5,404,485.

A2112 at 8:29-34. Thus, it is not surprising that Ban does not discuss any detail on how the host platform implement such applications.

In other words, Ban explicitly teaches that, after the memory device is connected to the host via the USB, the memory device is assigned with **a memory address**, instead of a drive symbol, such that other applications can access the memory device just like memory. The Board failed to consider why Ban has to be modified from its current form to combine with secondary references to teach the appealed claim without hindsight reasoning.

Even considering the block device mentioned by Ban, a standard block device interface only means data is to be accessed by the block size, and certainly does not require a magnetic disk drive. The referenced U.S. Pat. No. 5,404,485 (Ban II) only discloses "a flash memory, virtual mapping system that allows data to be continuously written to unwritten physical address locations." A2721 at Abstract. The application as disclosed by Ban II provides flash memory that

30

"emulates a random access memory, such as a disk memory, and the processor operating system software provides all other required operating support (such as a file system) in the same manner as it provides for a standard random access memory." A2728 at 3:66-4:4.

Thus, Ban II merely discloses how to use flash memory to emulate random access memory (RAM) to provide random access to flash memory blocks. Ban II is silent on magnetic disk drive or on magnetic disk operation.  Thus is could not have disclosed "processing the operation request in magnetic disk operation format issued from users upon plug said external storage device into said USB or IEEE 1394 interface of said data processing system" of claim 1 and "the driver converts the read command into special read instruction which can be understood and executed by the firmware" of claim 6.

Therefore, neither Ban nor Ban II discloses at least "processing the operation request in magnetic disk operation format issued from users upon plug said external storage device into said USB or IEEE 1394 interface" of claim 1. In addition, neither Ban nor Ban II discloses at least "the driver converts the read command into special read instruction which can be understood and executed by the firmware" of claim 6.

### 3.    Terasaki as the primary reference

The Board did not dispute that Terasaki requires USB-ATA or USB-IDE conversion. A37-A38. Thus, under proper claim construction, Terasaki cannot teach the "directly accessing" feature of claim 1 at least because these additional protocol conversions. However, the Board solely relied on its different claim construction of this term as "firmware directly controlling accessing." As previously explained, the Board's claim construction is erroneous and, thus, the rejections based on Terasaki should be set aside.

Further, the Board and SanDisk did not present any argument regarding Terasaki's failure to teach the "magnetic disk operation format" feature of claim 1 that is raised in Netac Technology's appeal to the Board. *See* A3689 ("but this still does not disclose how to process requests from the user in magnetic disk format").

Other than claim 1, the Board did not address the Terasaki based rejections of any other claim. SanDisk indicated that the rejections of other claims are the same as the Ban rejections, and should rise or fall together. A3765. That is mistaken. Even for claim 6, unlike Ban, Terasaki relied on reference Gupta. *See* A2901-A2902; A2931-2932. As explained previously, Gupta also fails to teach these features of claim 1 and claim 6.

32

### 4.    Margalit as the primary reference

Margalit discloses two embodiments, one relevant embodiment is a USB memory device called USB key device, as shown in FIG. 1 of Margalit below.



Margalit teaches a "USB key device 10 [that] comprises a PCB 25 which includes a microprocessor or CPU 30 . . . a USB interface device 40; firmware memory 50 serving the firmware of the microprocessor 30; RAM memory 60 of size sufficient to enable contemplated computations on the part of the microprocessor 30; and user data memory 70 which stores a user's data." A2133 at 2:37-45.

That is, in Margalit, the USB key device 10 is "analogous to a memory card" with a simple protocol conversion so that a USB host 20 can use the user data memory 70 based on USB protocol. A2133 2:34-3:14.

33

More specifically, "[t]he flow of data typically comprises the following flow: The USB interface chip 40 receives USB packets from the USB host 20, parses the data, and feeds the parsed data to the microprocessor 30. The microprocessor 30 writes the data to, or reads the data from, the firmware memory 50, the RAM 60 or the user's data memory 70, using each memory's protocol." A2133 at 3:5-11.

Similar to Ban, Margalit disclose a memory device accessible over USB. *Unlike* the claimed invention, however, Margalit does not disclose to have a host driver portion to implement a removable USB disk drive. Indeed, Margalit is silent on any interaction with a host operating system or any external storage driver. Margalit does not mention how the host computer interfaces with the memory card other than using a USB protocol conversion. In any case, Margalit does not provide sufficient disclosure beyond the described USB memory card.

Thus, Margalit cannot teach at least "processing the operation request in **magnetic disk operation format** issued from users upon plug said external storage device into said USB or IEEE 1394 interface" of claim 1, or "the driver converts the read command into **special read instruction** which can be understood and executed by the firmware" of claim 6.[3]

---

[3] SanDisk also relied on USB 1.1 to teach the "special read instruction" feature of claim 6. But USB 1.1 is a general specification of USB, not for disk-level operations. Unless specific teaching can be presented in USB 1.1, speculations on how USB can be used is just hindsight reasoning.

**D.    The Patent Office Failed to Perform Sufficient Fact-finding to Support the Rejections with Substantial Evidence**

**1.    The Patent Office Failed to Perform Fact-findings for Making the Obviousness Rejections**

After *KSR International Co. v. Teleflex Inc.*, 550 U.S. 398 (2007), the Patent Office revised its requirements for Examiners when determining the non-obviousness under 35 U.S.C. § 103.

> When making an obviousness rejection, Office personnel must therefore ensure that the written record includes findings of fact concerning the state of the art and the teachings of the references applied. . . . Factual findings made by Office personnel are the necessary underpinnings to establish obviousness.

M.P.E.P. § 2141(II).

> Once the *Graham factual inquiries* are resolved, Office personnel must determine whether the claimed invention would have been obvious to one of ordinary skill in the art.
>
> . . .
>
> The key to supporting any rejection under 35 U.S.C. 103 is the *clear articulation* of the reason(s) why the claimed invention would have been obvious. The Supreme Court in KSR noted that the analysis supporting a rejection under 35 U.S.C. 103 should be made explicit.

M.P.E.P. § 2141(III)

However, in the present case, the Examiner neither made findings of fact concerning the state of the art or the teachings of the references applied, *i.e.*, *the Graham factors*, nor articulated any rationales of the Section 103 rejections of claims 1-22. A540. For a few grounds with indication of reasons to combine, the

35

Examiner just gave a one-sentence universal rationale: such combination is "no more than applying a known technique to a known method to yield predictable results" without any reasoning. A547-A558.

Further, instead of considering the claim as a whole as required, the Examiner distilled the claimed invention into a few "gist" and made conclusive assertions against all claims without analysis or articulation based on these "gist."

> In the prior examination, patent owner **conceded** that the features that distinguish the invention from San are the limitations directed to **the use of a DC power supply and displaying a device symbol**. The examiner agrees that San discloses the limitations directed to the use of a DC power supply. . . that Guide makes the limitations directed to displaying a device symbol

A547 (emphases added).[4]

Essentially, the Examiner just treated the claimed invention as "the use of a DC power supply and displaying a device symbol." Thus, without sufficient fact findings and explicit rationales, and without analyzing the claims as a whole, all rejections should be set aside.

### 2. The Examiner Failed to Consider Netac Technology's Declarations and Related Documents

During the reexamination, Netac Technology submitted numerous declarations and supporting documents, including ten declarations and at least 14

---

[4] Netac Technology did not concede as such. Even if it did agree these features can distinguish the invention from prior art during prosecution, Netac Technology never conceded these features were the only distinguishable limitations.

accompanying exhibits covering relevant circuitry design, design documents, photos of circuit boards and prototypes, memory maps, software/firmware designs, bill of materials, and receipts, etc., sufficient to establish conception and reduction-to-practice dates. *See* A1975-A2070; A2602-A2635; A3515-A3571; A3656-A3661. The Examiner failed to consider most of these documents, if any at all, much less to consider substance of these declarations and exhibits.

The Examiner considered one of the declaration and one exhibit (which is receipt) and, then, dismissed all the declarations and exhibits simply because the declarant "does not even cite to any of the attachments to the declaration." A1943. This statement is wrong, as there are numerous instances in which the declarations mentions the attached exhibits. *See* A3519-A3525.

Another reason the Examiner relied on is "the only identifying information provided for all of the exhibits are NETAC file numbers which presumably indicates that the evidence was kept in NETAC's files." *Id*. Those numbers are just bates numbers for recording documents in a litigation, and should not be taken into consideration as evidence against Netac Technology. *See*, *e.g.*, A2602-A2635.

The Board agreed that the Examiner completed considering all such materials. A22. Similarly, the Board also avoided considering the substance of these materials, but faulted the declarants that "the declarations do not allege, let alone show, that the content of the documents was known to anyone other than the co-inventors." A28.

To reach such conclusion, the Board relied on *Spansion, Inc. v. Int'l Trade Comm'n*, 629 F.3d 1331 (Fed. Cir. 2010), and the Board stated:

> In short, there is insufficient evidence to demonstrate that the inventors "disclosed to others [their] completed thought expressed in such clear terms as to enable those skilled in the art to make the invention." *Spansion*, 629 F.3d at 1356

A29.

However, this is a quote out of the context. In fact, *Spansion* states:

> . . . **an inventor's oral testimony** regarding conception must be corroborated by "evidence which shows that the inventor disclosed to others his completed thought expressed in such clear terms as to enable those skilled in the art to make the invention." *Coleman v. Dines*, 754 F.2d 353, 359 (Fed.Cir.1985) (internal quotation marks omitted). Conception may be corroborated even if no single piece of evidence shows complete conception. *Price v. Symsek*, 988 F.2d 1187, 1196 (Fed.Cir.1993). Instead, all of the evidence of record must be collectively evaluated in determining when the invention was conceived. *Id.*

*Spansion* at 1356 (emphases added).

While in *Spansion* it was the oral testimony from the inventors at issue, in the present case, all evidence was in the form of documents.[5] The Examiner's reasoning is not correct in evaluating such declarations.

---

[5] The Board failed to recognize that prior conception can be proven in two separate, but related ways: (1) through the testimony of an inventor, provided the party introduces evidence to corroborate the oral testimony of conception; or (2) directly through documentary evidence, if the documents are sufficient to enable those skilled in the art to understand the invention concept. *See Mahurkarv. C.R. Bard, Inc.*, 79 F.3d 1572, 1577-78 (Fed. Cir. 1996) (citing *Price v. Symsek*, 988 F.2d 1187, 1195 (Fed. Cir. 1996)).

However, even if assuming that the inventors need to disclose their inventions to others, Netac Technology's declaration submitted on February 3, 2009 sufficiently satisfied such requirement. *See*, *e.g.*, A595-A596; A601-A602.

Thus, because not all of the evidence of record was considered, the Board's rejections should be set aside or be remanded.[6]

Further, more importantly, both the Board and the Examiner seemingly focused on that, because the inventors moved from Singapore to China by July 1999, and that China was not a NAFTA or WTO member at that time, there could not be any reduction-to-practice date later than July 1999.

Both the Board and the Examiner were wrong. "[A]n applicant for a patent, or a patentee, may not establish a date of invention by reference to knowledge or use thereof, or other activity with respect thereto, in a foreign country other than a NAFTA country or a WTO member country, <u>except as provided in sections 119 and 365 of this title</u>." 35 U.S.C. § 104(a)(1) (emphasis added).

That is, the patent law in fact provides an exception to allow the patentee to establish its constructive reduction-to-practice date by relying on the filing date of

---

[6] The Examiner in the related reexamination proceeding (Control No. 95/001,747) of a continuation determined a conception date of February 2, 1999.

the Chinese priority patent application relied on by the '672 patent, even if China was not a NAFTA or WTO member at that time.[7]

Therefore, because the Patent Office performed only insufficient fact-findings, the Board's Decision should be remanded back to the Patent Office or be set aside. A sufficient fact-finding can establish Netac Technology's prior invention date of at least February 2, 1999, which would disqualify the Ban reference. A3661.

### 3.    The Patent Office's Failure to Allow Netac Technology to Submit Rebuttal Evidence is Prejudicial

The Examiner did not mention Netac Technology's supplemental declarations submitted on March 15, 2010 in RAN. These supplemental declarations were submitted in Owner's Comments to the ACP to rebut SanDisk's newly asserted misleading allegations attacking the credibility of the inventors in SanDisk's Comments to the First Office Action. A3910-A3911.

Clearly, it was an error for the Examiner not to address Netac Technology's supplemental declarations submitted to rebut SanDisk's allegations and new evidences in its Comments to the First Office Action. However, the Board insisted that these declarations could not be entered because they were filed after the ACP. A24. In fact, the Board did not consider any of those supplemental declarations. *Id.*

---

[7] The Board mentioned this in its Decision, but dismissed this based on insufficient evidence, without any fact-finding. A30.

However, it was SanDisk that made these untimely misleading allegations, and Patent Owner's Comments to the ACP is the earliest chance Netac Technology had to rebut such allegations. Not allowing these supplemental declarations is substantially prejudicial to the Netac Technology.

Further, SanDisk addressed Netac's supplemental declarations and exhibits in its Comments after Action Closing Prosecution filed on April 13, 2010. A1921-A1927. Because the Examiner incorporated SanDisk's arguments in the Right of Appeal Notice (RAN), such supplemental declarations should have been deemed as already having been considered by the Examiner. The Board's holding on this issue is wrong and should be remanded or reconsidered.

### 4. The Examiner Failed to Determine Publication Dates of Multiple Applied References

SanDisk did not properly establish the publication dates of the applied references, at least for the references Windows 98, Fujifilm, and RATOC. "A reference is proven to be a 'printed publication' 'upon a satisfactory showing that such document has been disseminated or otherwise made available to the . . . [public]'" M.P.E.P. § 2128.

There was no publication date printed on the Windows 98 reference. This reference was only marked with "First Printing: August 1999." A2655. However, this date is certainly not the publicly available date, as it took time to go from printing to publicly on sale or even went on sale.

Similarly, there was no publication date printed on the Fujifilm reference. There was an *EC Declaration of Conformity* date of April 1, 1999, but there was no other information illustrating any date when the Fujifilm Manual is available publicly, not even a copyright date. A2139. Nothing is provided to indicate that Fujifilm Manual is indeed publicly available before the claimed invention.

RATOC is a User Guide, and there was no publication date printed on the User Guide. A2209. There was a date of May 1999, Rev. 1.1, printed on the front page of the User Guide, but there was no other information illustrating any date when or whether the RATOC Manual is available publicly. Without any evidence supporting that RATOC Manual is indeed publicly available before the claimed invention, RATOC Manual cannot qualify as a prior art reference.

Thus, without any evidence supporting a definite "publication date," Windows 98, Fujifilm, and RATOC should be disqualified as prior art reference, and all rejections based on these references be reversed or remanded for further investigation. Indeed, if these three references are disqualified as prior art, most grounds of rejections (39 to be exact) would be removed. A9-A11.

## VI.    CONCLUSION AND STATEMENT OF RELIEF SOUGHT

Based on the foregoing, the Court should construe the '672 patent claims in accordance with Netac Technology's proposals and reverse all of the Board's prior art rejections. Alternatively, the Court should remand to the Patent Office for

sufficient fact-finding and for considering the references under the correct claim constructions for all claims.

It should be noted that, because not all disputed claim terms are discussed in this appeal, if any of the Board's claim construction is erroneous, the Court should at least remand to the Board to reconsider other claim terms.

## VII.   REQUEST FOR ORAL ARGUMENT

Appellant Netac Technology respectfully requests oral argument in this appeal. As detailed above, this appeal raises numerous, complex issues regarding claim constructions, prior art rejections, and fact-findings. Oral argument will materially assist this Court in deciding the issues in dispute by affording the parties an opportunity to address any questions the Court may have.

/s/ Xiaoqun Wu
Xiaoqun Wu
ANOVA LAW GROUP, PLLC
21351 Gentry Drive
Suite 150
Sterling, VA  20166
(571) 379-9468

*Counsel for Appellant*

# ADDENDUM

# ADDENDUM
# TABLE OF CONTENTS

**Page:**

Patent Board Decision – Examiner Affirmed
    dated December 31, 2013 ......................................................................Add. 1

Decision on Reconsideration – Denied
    dated January 27, 2015 ..........................................................................Add. 45



UNITED STATES PATENT AND TRADEMARK OFFICE

UNITED STATES DEPARTMENT OF COMMERCE
United States Patent and Trademark Office
Address: COMMISSIONER FOR PATENTS
P.O. Box 1450
Alexandria, Virginia 22313-1450
www.uspto.gov

| APPLICATION NO. | FILING DATE | FIRST NAMED INVENTOR | ATTORNEY DOCKET NO. | CONFIRMATION NO. |
|---|---|---|---|---|
| 95/000,384 | 07/09/2008 | 6829672 | 237325-000005 | 4170 |

84310        7590        12/31/2013

Troutman Sanders LLP
The Chrysler Building
405 Lexington Avenue
New York, NY 10174

| EXAMINER |
|---|
| REICHLE, KARIN M |

| ART UNIT | PAPER NUMBER |
|---|---|
| 3992 | |

| MAIL DATE | DELIVERY MODE |
|---|---|
| 12/31/2013 | PAPER |

**Please find below and/or attached an Office communication concerning this application or proceeding.**

The time period for reply, if any, is set in the attached communication.

PTOL-90A  (Rev. 04/07)

Add. 1

UNITED STATES PATENT AND TRADEMARK OFFICE

―――――――――

BEFORE THE PATENT TRIAL AND APPEAL BOARD

―――――――――

SANDISK CORPORATION
Requester and Respondent

v.

NETAC TECHNOLOGY CO., LTD.
Patent Owner and Appellant

―――――――――

Appeal 2013-004839
Reexamination Control 95/000,384
Patent US 6,829,672 B1
Technology Center 3900

―――――――――

Before HOWARD B. BLANKENSHIP, STANLEY M. WEINBERG, and
JOHN A. EVANS, *Administrative Patent Judges*.


BLANKENSHIP, *Administrative Patent Judge.*

Appeal 2013-004839
Reexamination Control 95/000,384
Patent US 6,829,672 B1

DECISION ON APPEAL

STATEMENT OF THE CASE

In this *inter partes* reexamination proceeding, Patent Owner Netac
Technology Co., LTD appeals under 35 U.S.C. § 134(b) (2002) from the
final decision of the Examiner unfavorable to the patentability of claims 1-
22 of US patent 6,829,672, which are all the claims in the patent. Requester
SanDisk Corporation responds. Oral hearing was on May 8, 2013.[1] We
have jurisdiction under 35 U.S.C. § 315 (2002).

We affirm.

*Invention*

The '672 patent relates to an electronic flash memory external storage
method for data processing systems. '672 patent Abstract. Power for the
external device is provided by the host via a USB (Universal System Bus) or
IEEE1394 bus, and the data exchange is in accordance with the USB or
IEEE1394 standard. '672 patent col. 6, ll. 28-47. When the external flash
memory storage device is plugged into the data processing host, a driver
coordinates with firmware that resides in the electronic flash device. The
driver coordinates with the firmware to initialize the device and assign a
display symbol for the external device. The driver processes operation
requests in magnetic disk operation format that are sent from the operating
system to the external device. The driver converts the operation instructions
into a format for execution by the firmware. *Id*. at col. 4, ll. 27-67.

---

[1] According to Requester, this proceeding is related to Reexamination
Control No. 95/001,747. Oral Hearing Tr. 39-40.

Appeal 2013-004839
Reexamination Control 95/000,384
Patent US 6,829,672 B1

Figure 7 of the '672 patent is reproduced below.



**FIG. 7**

Appeal 2013-004839
Reexamination Control 95/000,384
Patent US 6,829,672 B1

Figure 7 is said to be a software flowchart of a driver that is loaded between the bottom layer operating system and the upper layer operating system. '672 patent col. 8, ll. 34-49. FIG. 7 shows an initialization block S1 in response to the device being plugged in, a notifying the operating system to assign an external storage driver block S2, a waiting for operation request block S3, an operate the magnetic disk block S4, a plug-and-play or other supportable operation block S9, a processing operation block S10, a return process inform of result or state block S11, an operation for converting magnetic disc operation into electronic flash memory external storage device block S5, an operate electronic flash memory external storage device to package it in the format defined by USB block S6, a send the packaged operation to the firmware via the operating system and wait for operation return block S7, a return process information of result or state block S8, and a notify the operating system to remove the movable storage device block S12 in response to the external device being unplugged. *Id.* at col. 8, ll. 49-64.

*Claims*

Claim 1 is representative.

1. An electronic flash memory external storage method, comprising the steps of:

establishing data exchange channel between a data processing system and a portable external storage device based on USB or IEEE1394 bus upon plug said portable external storage device into said USB or IEEE 1394 bus interface of said data processing system;

4
Add. 5

Appeal 2013-004839
Reexamination Control 95/000,384
Patent US 6,829,672 B1

acquiring a DC power supply from said data processing
system for said external storage device through said USB or
IEEE1394 bus upon plug said portable external storage device
into said USB or IEEE 1394 bus interface;

configuring a flash memory storage module built-in said
external storage device, wherein the data storage structure of
the flash memory storage module is arranged on a block basis;

directly accessing data or information in the said flash
memory storage module based on USB or IEEE1394 bus
standard through said established data exchange channel by
implementing and processing the data access operation requests
issued by users, wherein said data processing system assigning
and displaying a device symbol for said external storage device
and processing the operation request in magnetic disk operation
format issued from users upon plug said external storage device
into said USB or IEEE 1394 interface of said data processing
system.

*Prior Art*

| Ban ("Ban II") | US 5,404,485 | Apr. 04, 1995 |
| Gupta | US 5,822,245 | Oct. 13, 1998 |
| Sartore | US 6,012,103 | Jan. 04, 2000 |
| Ban[2] | US 6,148,354 | Nov. 14, 2000 |
| Terasaki | US 6,292,863 B1 | Sep. 18, 2001 |
| Margalit | US 6,763,399 B2 | Jul. 13, 2004 |
| Kikuchi | WO 98/03915 | Jan. 29, 1998 |

---

[2] Patent Owner contests the status of Ban, Terasaki, and Margalit as prior
art.

Appeal 2013-004839
Reexamination Control 95/000,384
Patent US 6,829,672 B1

Paul McFedries, The Unauthorized Guide to
Windows® 98 Second Edition (1999). ("Guide").

Compaq Computer Corp., et al., Universal Serial Bus
Specification (Revision 1.1), September 23, 1998. ("USB
1.1").

Fuji Photo Film (Europe) G.m.b.H., Image Memory Card
Reader SM-R1: for Windows®98/ Macintosh (Owner's
Manual), April 1, 1999. ("FujiFilm").

RATOC Systems, Inc., USB Port SmartMedia Reader/ Writer
SMA03U, User Guide (Rev. 1.1), May 1999. ("RATOC").

Advertisement for Netac Tech. Co., Ltd., "'A Very Small
Floppy'–the ONLY DISC," appearing in China
Computerworld, October 4, 1999 (with English translation).
("Netac").

*Appellant's Contentions*

Appellant contends that the Examiner erred in adopting any of 52
rejections under 35 U.S.C. § 103(a) that were proposed by the Requester,
over prior art applied against the claims as shown in the tables below.  The
rejections are based on various combinations of art that are denoted as
"primary" and "secondary" references.  Ban, Terasaki, Margalit, and Sartore
are the "primary" or base references.  The claim charts from the original
reexamination request are provided in the Patent Owner's Appeal Brief's

Appeal 2013-004839
Reexamination Control 95/000,384
Patent US 6,829,672 B1

Evidence Appendix as Exhibits 47, 48, 49, and 50--"Ex. 47, 48, 49, and 50."[3]

| "Primary" References |
| --- |
| Ban |
| Terasaki |
| Margalit |
| Sartore |

| "Secondary" References |
| --- |
| Ban II |
| USB 1.1 |
| FujiFilm |
| RATOC |
| Guide |
| Netac |
| Kikuchi |
| Gupta |

The references are applied under 35 U.S.C. § 103(a) against the claims as follows:

---

[3] Unless otherwise indicated, in this opinion "Ex." will refer to the corresponding exhibit in the Evidence Appendix of the Appeal Brief.

Appeal 2013-004839
Reexamination Control 95/000,384
Patent US 6,829,672 B1

| References | Claims |
|---|---|
| Ban, Guide | 1-6 and 15-18 |
| Ban, Netac | 1-6 and 15-18 |
| Ban, FujiFilm | 1-6, 11, and 15-18 |
| Ban, RATOC | 1-6, 11, and 15-18 |
| Ban, Guide, Gupta | 7-10 and 19-22 |
| Ban, Netac, Gupta | 7-10 and 19-22 |
| Ban, FujiFilm, Gupta | 7-10 and 19-22 |
| Ban, RATOC, Gupta | 7-10 and 19-22 |
| Ban, Guide, Kikuchi | 11-14 |
| Ban, Netac, Kikuchi | 11-14 |
| Ban, FujiFilm, Kikuchi | 11-14 |
| Ban, RATOC, Kikuchi | 11-14 |
| Terasaki, Ban II, Guide | 1, 16, and 17 |
| Terasaki, Ban II, Netac | 1, 16, and 17 |
| Terasaki, Ban II, FujiFilm | 1, 11, 16, and 17 |
| Terasaki, Ban II, RATOC | 1, 11, 16, and 17 |
| Terasaki, Ban II, USB 1.1, Guide | 1-5 and 15-18 |
| Terasaki, Ban II, USB 1.1, Netac | 1-5 and 15-18 |
| Terasaki, Ban II, USB 1.1, FujiFilm | 1-5, 11, and 15-18 |
| Terasaki, Ban II, USB 1.1, RATOC | 1-5, 11, and 15-18 |
| Terasaki, Ban II, USB 1.1, Guide, Gupta | 6-10 and 19-22 |
| Terasaki, Ban II, USB 1.1, Netac, Gupta | 6-10 and 19-22 |
| Terasaki, Ban II, USB 1.1, FujiFilm, Gupta | 6-10 and 19-22 |
| Terasaki, Ban II, USB 1.1, RATOC, Gupta | 6-10 and 19-22 |
| Terasaki, Ban II, Guide, Kikuchi | 11-14 |

Appeal 2013-004839
Reexamination Control 95/000,384
Patent US 6,829,672 B1

| References | Claims |
|---|---|
| Terasaki, Ban II, Netac, Kikuchi | 11-14 |
| Terasaki, Ban II, FujiFilm, Kikuchi | 11-14 |
| Terasaki, Ban II, RATOC, Kikuchi | 11-14 |
| Margalit, Ban II, Guide | 1-6 and 15-18 |
| Margalit, Ban II, Netac | 1-6 and 15-18 |
| Margalit, Ban II, FujiFilm | 1-6 and 15-18 |
| Margalit, Ban II, RATOC | 1-6 and 15-18 |
| Margalit, Ban II, Guide, Gupta | 7-10 and 19-22 |
| Margalit, Ban II, Netac, Gupta | 7-10 and 19-22 |
| Margalit, Ban II, FujiFilm, Gupta | 7-10 and 19-22 |
| Margalit, Ban II, RATOC, Gupta | 7-10 and 19-22 |
| Margalit, Ban II, Guide, Kikuchi | 11-14 |
| Margalit, Ban II, Netac, Kikuchi | 11-14 |
| Margalit, Ban II, FujiFilm, Kikuchi | 11-14 |
| Margalit, Ban II, RATOC, Kikuchi | 11-14 |
| Sartore, Ban II, USB 1.1, Guide | 1-5 and 15-18 |
| Sartore, Ban II, USB 1.1, Netac | 1-5 and 15-18 |
| Sartore, Ban II, USB 1.1, FujiFilm | 1-5, 11, and 15-18 |
| Sartore, Ban II, USB 1.1, RATOC | 1-5, 11, and 15-18 |
| Sartore, Ban II, USB 1.1, Guide, Gupta | 6-10 and 19-22 |
| Sartore, Ban II, USB 1.1, Netac, Gupta | 6-10 and 19-22 |
| Sartore, Ban II, USB 1.1, FujiFilm, Gupta | 6-10 and 19-22 |
| Sartore, Ban II, USB 1.1, RATOC, Gupta | 6-10 and 19-22 |
| Sartore, Ban II, USB 1.1, Guide, Kikuchi | 11-14 |
| Sartore, Ban II, USB 1.1, Netac, Kikuchi | 11-14 |

Appeal 2013-004839
Reexamination Control 95/000,384
Patent US 6,829,672 B1

| References | Claims |
|---|---|
| Sartore, Ban II, USB 1.1, FujiFilm, Kikuchi | 11-14 |
| Sartore, Ban II, USB 1.1, RATOC, Kikuchi | 11-14 |

Appeal 2013-004839
Reexamination Control 95/000,384
Patent US 6,829,672 B1

ANALYSIS

We have considered the arguments and evidence provided by Patent Owner but we are not persuaded of error in any of the applied rejections. For any of Patent Owner's timely arguments that are not specifically addressed in this opinion, we refer to the persuasive response to the arguments in Respondent's Brief.

Claims 1, 19, 20, 21, and 22 are independent. In this opinion, in view of Appellant's arguments in the Appeal Brief, unless we indicate otherwise, we will address claim 1 as representative of the invention. *See* 37 C.F.R. § 41.67(c)(1)(vii).

Appeal 2013-004839
Reexamination Control 95/000,384
Patent US 6,829,672 B1

*Sartore*

Figure 2 of Sartore is reproduced below.[4]



FIG. 2

Figure 2 is said to be a diagram illustrating a USB system. Sartore
col. 3, ll. 41-42. Computer system 50 includes a host computer 52
connected to a peripheral device 54 by a USB 60. One or more peripheral
device drivers may be stored in the host computer's operating system. The

---

[4] Sartore is prior art under 35 U.S.C. § 102(e)(2) (2002). Patent Owner has
made no attempt to antedate Sartore, which has a § 102(e) date of July 2,
1997.

Appeal 2013-004839
Reexamination Control 95/000,384
Patent US 6,829,672 B1

operating system may also include configuration data for a particular

peripheral device, such as which device driver to use. *Id*. at col. 4, ll. 52-66.

Peripheral device 54 includes a USB interface system 71 and a USB

interface circuit 76. Memory 74 in the interface circuit may contain an

identification code to indicate which configuration information set should be

downloaded to the peripheral device. The USB circuit is designed to meet

USB standard specifications, such as communications protocols and

electrical specifications. *Id*. at col. 5, ll. 6-24.

Figure 4 of Sartore is reproduced below.



FIG. 4

Figure 4 is said to be a diagram illustrating a USB interface circuit

that permits the peripheral device to be electronically disconnected and/or

reconnected to the USB without physically disconnecting and reconnecting

Appeal 2013-004839
Reexamination Control 95/000,384
Patent US 6,829,672 B1

the peripheral device from the USB (i.e., simulating an electrical
disconnect/connect cycle). Sartore col. 6, ll. 34-40. As with the
conventional USB interface, the host computer USB interface circuit 100
includes two USB data leads 102, 103 (D+ and D-). The peripheral USB
interface circuit 120 includes a buffer output 124 labeled D+ and a second
buffer output 126 labeled D-. The D+ data lead is connected to a supply
voltage (e.g., 3.3 volts) through a 1.5 kΩ resistor 128 and an electrical
switch 130. *Id*. at ll. 40-56.

When a peripheral device is connected to the USB, the electrical
switch permits the peripheral device to disconnect and then reconnect itself
to the USB without the physical disconnection of the peripheral device from
the USB. If the peripheral device is physically connected to the USB but the
electrical switch is open, the D+ data lead is no longer connected to the
supply voltage and the host computer determines that the peripheral device
has been disconnected even though the peripheral device remains physically
connected to the USB. Similarly, when the electrical switch is closed again,
the D+ data lead is again connected to the supply voltage, and the host
computer will detect that the peripheral device has been reconnected to the
USB. Sartore col. 6, l. 65-col. 7, l. 7.

*USB 1.1*

The USB transfers signal and power over a four-wire cable. USB 1.1
at 17. Figure 4.2 of USB 1.1 is reproduced below.

Appeal 2013-004839
Reexamination Control 95/000,384
Patent US 6,829,672 B1



Figure 4-2. USB Cable

Figure 4.2 depicts a USB cable. The cable carries VBUS--nominally, 5 Volts at the source--and GND wires to deliver power to devices. USB 1.1 at 17. The host supplies power for use by USB devices that are directly connected, although any USB device may have its own power supply. USB devices that rely totally on power from the cable are called bus-powered devices. *Id.* at 18; *see also id.* at 134 *et seq.* (§ 7.2, Power Distribution).

*Sartore and the Secondary References*

Patent Owner argues, in essence, that *none* of the limitations of claim 1 are taught by the applied prior art. Although Patent Owner's Appeal Brief is replete with the phrase that the applied prior art "teaches away," Patent Owner provides little or no evidence or reasoning in support of the allegations. "A reference may be said to teach away when a person of ordinary skill, upon [examining] the reference, would be discouraged from following the path set out in the reference, or would be led in a direction divergent from the path that was taken by the applicant." *Para-Ordnance Mfg. v. SGS Importers Int'l, Inc.,* 73 F.3d 1085, 1090 (Fed. Cir. 1995) (alteration in original) (quoting *In re Gurley,* 27 F.3d 551, 553 (Fed. Cir. 1994)). Patent Owner's allegations of "teaching away" are based on the

Appeal 2013-004839
Reexamination Control 95/000,384
Patent US 6,829,672 B1

view that the references contain some teachings that might be not directly related to the claimed subject matter. However, the prior art's mere disclosure of more than one alternative does not constitute a teaching away from any of the alternatives when the disclosure does not criticize, discredit, or otherwise discourage the solution claimed. *In re Fulton*, 391 F.3d 1195, 1201 (Fed. Cir. 2004) (quoting *In re Gurley*, 27 F.3d 551, 553 (Fed. Cir. 1994)).

We will consider the claim 1 features that Patent Owner alleges to be not taught by Sartore and the secondary references.

### I. Acquiring a DC Power Supply . . . Through Said USB or IEEE 1394 Bus

Patent Owner alleges that Sartore "teaches away" from acquiring a DC power supply from the USB interface. Patent Owner submits that Sartore discloses that the USB interface circuit connects to the two data lines (D+ and D-) and that the D+ line is connected to a 3.3 Volt supply voltage. According to Patent Owner, the 3.3 Volt supply voltage "is clearly not in conformity with the 5.0 volts standard voltage that is supplied from the USB power line." App. Br. 53.

However, the 3.3 Volt supply voltage described by Sartore is voltage at the peripheral device for raising and lowering the voltage of the D+ data lead. We agree with Patent Owner to the extent that Sartore's Figure 4 is silent with respect to the peripheral device's source of power. But the USB 1.1 standard allows for a host to power a peripheral device via the USB interface. One of ordinary skill in the art would have appreciated that the

Appeal 2013-004839
Reexamination Control 95/000,384
Patent US 6,829,672 B1

3.3 Volt supply voltage at the peripheral device could easily be derived from
a 5 Volt source from the host. Moreover, Sartore discloses, expressly, that
the peripheral device may utilize the electrical power supplied by the bus,
such that the device does not require its own electrical power source.
Sartore col. 2, ll. 57-65.

Patent Owner also argues that if Sartore's (Fig. 4) interface circuit
acquires DC power from the USB interface, then an additional switch must
be included to turn on/off the DC power from the USB interface,
complicating the circuit design. App. Br. 53. Patent Owner does not further
explain the position nor provide evidence in support of the theory. We do
not see why an "additional switch" would be necessary for turning power on
or off from the USB interface, when physically connecting and
disconnecting the peripheral device would turn on and turn off power in a
bus-powered device. Further, as we have noted, Sartore teaches that the
invention provides the advantage of maintaining the DC power to the
peripheral device, even when the host does not recognize that the peripheral
device is connected. Sartore col. 2, ll. 57-65.

We agree with the Examiner and Requester that Sartore does not
"teach away" from acquiring DC power from the USB interface and, indeed,
in view of Sartore's disclosure and the details provided in the USB 1.1
specification, *teaches* acquiring DC power from the USB interface.

Appeal 2013-004839
Reexamination Control 95/000,384
Patent US 6,829,672 B1

> *II. Said Data Processing System Assigning and*
> *Displaying a Device Symbol for Said External Storage*
> *Device*

Each of FujiFilm and RATOC provides evidence that it would have
been obvious to assign and display a device symbol for the external storage
device. FujiFilm 12; RATOC 25. We agree with the Examiner and
Requester that Patent Owner's arguments that FujiFilm and RATOC are
directed to memory card readers are inapposite, as the rejections rely on the
references' teachings with respect to display of an icon on a computer
display, rather than the details of the external storage device. Resp. Br. 14.

Patent Owner argues that FujiFilm and RATOC "teach away" from
the claimed invention because the references teach a type of protocol
conversion that was allegedly disclaimed during prosecution of the original
patent. App. Br. 30-31. We will address that position, *infra*, in our
discussion of Terasaki. For the purposes of the rejections based on Sartore,
we agree with Requester that Patent Owner's arguments are inapposite
because the rejections do not rely on FujiFilm or RATOC as teaching
"directly accessing" data or information in the flash memory storage module
as claimed. Resp. Br. 14. Patent Owner's "teaching away" arguments are
based on the idea of bodily incorporating the entire structure of FujiFilm or
RATOC with the base references such as Sartore, which is not responsive to
the proposed rejections. Even assuming that the phrase "directly accessing"
in claim 1 distinguishes over a protocol conversion as taught by FujiFilm
and RATOC, Patent Owner has not identified any warning to the artisan in
the references to avoid accessing data in flash memory without performing a
protocol conversion. *Cf. Para-Ordnance Mfg*, 73 F.3d at 1090.

Appeal 2013-004839
Reexamination Control 95/000,384
Patent US 6,829,672 B1

*III. Configuring a Flash Memory Storage Module . . .*
*Wherein the Data Storage Structure of the Flash Memory*
*Storage Module is Arranged on a Block Basis*

We agree with the Examiner and Requester that Ban II discloses that
its memory is arranged on a block basis (*e.g.*, col. 2, ll. 1-30). Individual
blocks are addressed and accessed for read and write commands (Ban II,
*e.g.*, col. 5, ll. 18-52), and memory is addressed by block number (*id.* at col.
4, ll. 32-37). As Requester indicates, Patent Owner has not demonstrated
that the claim language distinguishes over blocks being organized,
additionally, into units or other structures. Resp. Br. 17. Further, Patent
Owner's argument that Ban II is not enabling because it does not expressly
describe how to "configure" the flash memory is not consistent with the '672
patent disclosure, which also fails to expressly describe how to "configure"
the memory. That is, the claimed configuration must be within the
knowledge of one of ordinary skill in the art. *Id.* at 18. *See In re Epstein*, 32
F.3d 1559, 1568 (Fed. Cir. 1994) (Board's observation that appellant did not
provide the type of detail in his specification that he now argues is necessary
in prior art references supports the Board's finding that one skilled in the art
would have known how to implement the features of the references).

Appeal 2013-004839
Reexamination Control 95/000,384
Patent US 6,829,672 B1

> *IV. Establishing Data Exchange Channel Between a*
> *Data Processing System and a Portable External Storage*
> *Device Based on USB or IEEE 1394 Bus Upon Plug Said*
> *Portable External Storage Device Into Said USB or*
> *IEEE 1394 Bus Interface of Said Data Processing System*

Patent Owner contends (*e.g.*, App. Br. 36) that the "establishing a data exchange channel" language requires that the data channel must span from the requests issued by users to the flash memory module. We agree with the Examiner and Requester that there is insufficient basis for that interpretation of the claims. The data channel as claimed may exist anywhere between the host and the external storage device (*e.g.*, Resp. Br. 18).

> *V. Processing the Operation Request in Magnetic Disk*
> *Operation Format Issued From Users Upon Plug Said*
> *External Storage Device Into Said USB or IEEE 1394*
> *Interface of Said Data Processing System*

Ban II teaches a computer system in which flash memory emulates disk memory. Ban II col. 3, l. 51 - col. 4, l. 10. Patent Owner argues that the prior art does not teach processing the operation request "issued from users." App. Br. 47. However, one of ordinary skill in the art would appreciate that the principal purpose of a disk drive is to store and retrieve data for applications in response to *user* commands, such as storing and retrieving a word processing document in disk memory. We find Patent Owner's argument to be not persuasive.

Appeal 2013-004839
Reexamination Control 95/000,384
Patent US 6,829,672 B1

*Sartore, the Secondary References, and Dependent Claims*

At page 56 of the Appeal Brief, Patent Owner repeats previously considered arguments in defense of dependent claims. Patent Owner asserts, in addition, that Sartore fails to teach the limitations of claims 2, 3, and 4, as if Sartore alone were to be applied against the claims. However, non-obviousness cannot be established by attacking references individually where the rejection is based upon the teachings of a combination of references. *In re Merck & Co.*, 800 F.2d 1091, 1097 (Fed. Cir. 1986) (citing *In re Keller*, 642 F.2d 413, 425 (CCPA 1981)).

*Patent Owner's Rule 131 Effort*

*I. The Rule 131 Evidence Considered*

Patent Owner submits that it has filed declarations pursuant to 37 C.F.R. § 1.131 to show that the invention claimed in the '672 patent was conceived before November 1, 1998, or at least as early as February 2, 1999. App. Br. 6-7. Patent Owner further submits that the conception was coupled with due diligence to a reduction to practice of the invention in July 1999. *Id*. at 12. Proof of conception as early as February 2, 1999, with proof of the later activities would remove Ban from consideration as prior art in this proceeding. Proof of conception before November 1, 1998, with the further necessary proofs would remove Ban, Terasaki, and Margalit from consideration as prior art.

First, however, we must determine what Rule 131 evidence is before us. The Examiner considered declarations by the inventors of the '672 patent as indicated in the Action Closing Prosecution ("ACP"; mailed Jan.

Appeal 2013-004839
Reexamination Control 95/000,384
Patent US 6,829,672 B1

13, 2010).  On March 15, 2010, after the close of prosecution, Patent Owner submitted several "supplemental" declarations that Patent Owner relies upon in the Appeal Brief.  Requester in the Respondent Brief does not address the "supplemental" declarations.[5]  Requester contends that the evidence submitted after the ACP was not considered by the Examiner, and properly so, in accordance with the applicable rules and procedures.  Resp. Br. 2. Patent Owner acknowledges that the Examiner did not consider the declarations filed after the ACP.  Rebuttal Br. 1-2; *see also* Right of Appeal Notice ("RAN"; mailed Sept. 7, 2010) at 4-5.  Patent Owner argues, however, that the Examiner's failure to consider the evidence is appealable because it is directly related to the merits of the "rejections of the Patent Owner's priority claims."  Rebuttal Br. 2.  Patent Owner also submits that the two Rule 131 declarations that were considered by the Examiner should be sufficient to antedate Ban, Terasaki, and Margalit.  *Id*. at 4.

Entry of an affidavit or other evidence submitted after an action closing prosecution is not a matter of right.

> *An affidavit or other evidence submitted after* a final
> rejection or other final action (§ 1.113 ) in an application or in
> an *ex parte* reexamination filed under § 1.510 , or *an action*
> *closing prosecution (§ 1.949 ) in an inter partes reexamination*
> filed under § 1.913 but before or on the same date of filing an
> appeal (§ 41.31 or § 41.61 of this title), *may be admitted upon a*
> *showing of good and sufficient reasons why the affidavit or*
> *other evidence is necessary and was not earlier presented.*

---

[5] The Respondent Brief does, however, submit as "Exhibit L" an "Analysis of Improperly Submitted New Evidence," which Respondent reports was submitted as "Appendix A" to Requester's April 2010 Comments, and contends was incorporated by reference in the Right of Appeal Notice. Resp. Br. "Evidence Appendix."

Appeal 2013-004839
Reexamination Control 95/000,384
Patent US 6,829,672 B1

37 C.F.R. § 1.116(e) (emphasis modified). The Examiner's decision to not consider Patent Owner's proffered evidence does not go to the merits of the rejections on appeal but relates to the propriety of the procedural action of not entering evidence that was filed after an action closing prosecution. The Examiner's failure to enter and consider Patent Owner's evidence submitted after the ACP is not an appealable matter. Patent Owner's remedy, not elected, was to petition for supervisory review of the Examiner's application of the procedure set forth in § 1.116(e). Further, we will not, in the first instance, evaluate evidence that was not considered by the Examiner in our determination as to whether the Examiner erred in concluding that Patent Owner has failed to show applied patents to be antedated.

Thus, Patent Owner's Rule 131 evidence before us in this appeal consists of the Rule 131 declarations, and exhibits referenced therein, that were submitted to the Examiner prior to the ACP.[6] App. Br. 68 (Ex. 9-13). The evidence includes the "Deng Declaration" (executed Feb. 3, 2009; Ex. 9) and the "Cheng Declaration" (executed Feb. 3, 2009; Ex. 10). The evidence also includes the declaration by Mr. Feng Xiang (executed Feb. 3, 1999; Ex. 11). The declarations filed after the ACP, and the arguments in Patent Owner's briefs that are based thereon, have not been considered.

---

[6] Patent Owner is correct (App. Br. 9) that the ACP and RAN erroneously refer to the declarations being filed on July 9, 2008, which is the date of the original reexamination request. The declarations were filed on February 3, 2009.

Appeal 2013-004839
Reexamination Control 95/000,384
Patent US 6,829,672 B1

App. Br. 69 (Ex. 15-20). *See also* 37 C.F.R. § 41.67(c)(1)(ix) ("Reference to unentered evidence is not permitted in the brief.").[7]

### II. Rule 131

37 C.F.R. § 1.131 provides in pertinent part:

> (b) The showing of facts shall be such, in character and weight, as to establish reduction to practice prior to the effective date of the reference, or conception of the invention prior to the effective date of the reference coupled with due diligence from prior to said date to a subsequent reduction to practice or to the filing of the application. Original exhibits of drawings or records, or photocopies thereof, must accompany and form part of the affidavit or declaration or their absence must be satisfactorily explained.

---

[7] In any event, it appears from Patent Owner's Appeal Brief that the "supplemental" declarations were submitted, in the main, as evidence tending to show that inventive activity occurred in Singapore rather than in China. For reasons set forth *infra*, we need not determine where the activity occurred. The March 15, 2010 submission also included, apparently, material filed under seal in an envelope, which the panel has not reviewed and does not possess. *See* "Artifact Sheet" notice mailed March 15, 2010; App. Br. 70, Evidence Appendix items 29, 30 ("not produced").

Appeal 2013-004839
Reexamination Control 95/000,384
Patent US 6,829,672 B1

### III. Evidence of Conception

"Conception is the formation in the mind of the inventor of a definite
and permanent idea of the complete and operative invention, as it is
therefore to be applied in practice." *Singh v. Brake*, 317 F.3d 1334, 1340
(Fed. Cir. 2003) (internal quotation marks omitted) (quoting *Kridl v.
McCormick*, 105 F.3d 1446, 1449 (Fed. Cir. 1997).

Initially, we need to determine the critical date that Patent Owner
alleges with regard to conception. Patent Owner faults the Examiner for not
evaluating the evidence to determine if it is sufficient to show conception at
least as early as February 2, 1999. App. Br. 19-20. However, the inventors-
-those who should know--allege conception prior to November 1, 1998.
Deng Decl. ¶ 4; Cheng Decl. ¶¶ 4, 11. It is not surprising that the Examiner
evaluated the evidence for a showing of conception prior to November 1,
1998. In any event, we will consider the evidence in view of both dates that
are alleged by Patent Owner's counsel.

Next, we need to determine what it is that the inventors allege
conception of and how that may relate to the claimed invention of the '672
patent. Unfortunately, the inventor's declarations do not specifically address
the claims of the patent. The declarations, instead, allege strings of features
that were "conceived of" before November 1, 1998. Deng Decl. ¶ 4; Cheng
Decl. ¶ 4. Those paragraphs do not, however, refer to any evidence in
support of the allegations. "It has long been the case that an inventor's
allegations of earlier invention alone are insufficient--an alleged date of

Appeal 2013-004839
Reexamination Control 95/000,384
Patent US 6,829,672 B1

invention must be corroborated." *In re NTP, Inc.*, 654 F.3d 1279, 1291 (Fed. Cir. 2011) (citations omitted).

Because it is a mental act, an inventor's testimony regarding conception must be corroborated by "'evidence which shows that the inventor disclosed to others his completed thought expressed in such clear terms as to enable those skilled in the art to make the invention.'" *Spansion, Inc. v. Int'l Trade Comm'n*, 629 F.3d 1331, 1356 (Fed. Cir. 2010) (quoting *Coleman v. Dines*, 754 F.2d 353, 359 (Fed. Cir. 1985)).

The Cheng Declaration (¶ 11) refers to email correspondence with a journalist as evidence of conception of "the invention" prior to November 1, 1998--"Exhibit E," provided as Ex. 27. According to the provided English translation, Mr. Cheng, in an email apparently dated November 25, 1999,[8] answered that "[t]he idea was developed in October 1998." Insofar as the email can be considered corroborating evidence of conception, neither the email nor the Cheng Declaration details how the "idea" may relate to the claimed invention of the '672 patent.

The Deng Declaration (¶ 11) refers to a discussion with Mr. Feng Xiang concerning "the invention." The Xiang Declaration (executed Feb. 3, 1999; Ex. 11) avers that Mr. Xiang is the Chief Technical Officer of Patent Owner. Mr. Xiang testifies about a conversation in February 1999 with co-inventor Deng. We do not attach great weight to the testimony of an officer of the company that owns the subject patent, concerning a conversation that occurred ten years prior, absent supporting documentary evidence of the

---

[8] As Requester notes (Resp. Br. 9), the date of the email response appears to be prior to the date of the email to which it responds.

Appeal 2013-004839
Reexamination Control 95/000,384
Patent US 6,829,672 B1

items discussed in the conversation.  In any event, the Xiang Declaration
allegations do not extend to a "complete and operative" invention as
claimed.  The alleged conversation did not include discussion of, for
example, establishing a data exchange channel between a data processing
system and a portable external storage device based on USB or IEEE 1394
bus upon plugging the device into the bus interface nor the data storage
structure of the flash memory storage module being arranged on a block
basis (e.g., '672 patent Claim 1).  Nor do the inventors' declarations explain,
or otherwise remedy, the deficiency in showing prior disclosure of the
complete and operative invention that is claimed.  Further, the mere naming
of other features does not indicate that the inventive idea was so clearly
defined in co-inventor Deng's mind that "only ordinary skill would be
necessary to reduce the invention to practice, without extensive research or
experimentation." *Burroughs Wellcome Co. v. Barr Labs., Inc.*, 40 F.3d
1223, 1228 (Fed. Cir. 1994) (citing *Sewall v. Walters*, 21 F.3d 411, 415
(Fed. Cir. 1994).

The inventors' declarations also provide and address two single-page
documents that might be considered evidence of conception prior to April 5,
1999 (the filing date of Ban), although the declarations do not rely on the
documents as evidence of conception.  The documents, labeled "UFD
Software/firmware Block Diagram" and "Memory Mapping of UFD," are
provided as Ex. 12 and 13, respectively.  Each bears the date of February 2,
1999.  However, the declarations do not allege, let alone show, that the
content of the documents was known to anyone other than the co-inventors.
Nor do the documents themselves indicate otherwise.  The documents are

Appeal 2013-004839
Reexamination Control 95/000,384
Patent US 6,829,672 B1

not corroborating evidence of conception. In short, there is insufficient evidence to demonstrate that the inventors "disclosed to others [their] completed thought expressed in such clear terms as to enable those skilled in the art to make the invention." *Spansion*, 629 F.3d at1356.[9]

## IV. Evidence of Diligence and Reduction to Practice

"The Patent Office must have such facts as will enable it and its reviewing courts to judge whether there was construction and when it occurred, or whether there was diligence." *In re Harry*, 333 F.2d 920, 922 (CCPA 1964).

We do not reach consideration of Patent Owner's evidence of due diligence from prior to the effective date of Terasaki, Margalit, or Ban to a subsequent reduction to practice. Patent Owner has not provided, on this record, the critical showing of conception prior to any of the effective dates.

Patent Owner's evidence of the alleged reduction to practice in July 1999 is, quite simply, deficient. "To show actual reduction to practice, an inventor must demonstrate that the invention is suitable for its intended purpose." *Mahurkar v. C.R. Bard, Inc.*, 79 F.3d 1572, 1578 (citing *Scott v. Finney*, 34 F.3d 1058, 1061 (Fed. Cir. 1994)). The co-inventors merely allege that, with respect to a third prototype, they "got it to work in July, 1999." Cheng Decl. ¶ 7; Deng Decl. ¶ 7. The undated photographs (Ex. 21)

---

[9] Even if Ex. 12 and 13 were to evidence conception of something, we agree with Requester that it would not be the claimed invention of the '672 patent. Resp. Br. 9-10.

Appeal 2013-004839
Reexamination Control 95/000,384
Patent US 6,829,672 B1

of the "prototypes" do not demonstrate that the claimed invention of the '672 patent was tested and determined to work as intended, at any time.[10]

### V. Rule 131 - Conclusion

We agree with the Examiner that none of the art applied in this appeal has been antedated. Specifically, in view of the character and weight of the evidence that Patent Owner provides, none of the challenged references of Ban, Terasaki, and Margalit has been antedated.

---

[10] For reasons unstated, Patent Owner alleges that "due diligence" existed for periods after the alleged reduction to practice. App. Br. 23-24. Assuming that, contrary to the inventor's declarations, Patent Owner is alleging due diligence to the filing of the Chinese patent application(s), the evidence to which Patent Owner refers (*id.*) does not support diligence to a constructive reduction to practice. No evidence is proffered to show diligence in preparing a patent application between August 1999 and November 14, 1999, the filing date of the first of the Chinese patent applications. *See* Deng Decl. ¶ 19; Cheng Decl. ¶ 18.

Appeal 2013-004839
Reexamination Control 95/000,384
Patent US 6,829,672 B1

*Ban*

Figure 5 of Ban is reproduced below.



Figure 5 – A Computer Host System with a USB Flash Memory Device

Figure 5 is said to be a schematic block diagram of the main
components of a flash memory device. Ban col. 6, ll. 7-9. A flash memory
system 42 includes a host platform 44 that operates a USB flash device 46 as
non-volatile storage space. Host platform 44 connects to USB flash device
46 through USB host connector 50, USB cable 48, and USB flash device
connector 52. Host platform 44 includes USB host controller 54, and flash
device 46 includes USB flash device controller 56. Flash device 46 contains
flash memory module 58, in which the data is stored. *Id.* at ll. 9-27.

Patent Owner contends that Ban "teaches away" from acquiring DC
power from the USB interface of the data processing system "by suggesting
that the power is acquired from the USB flash device controller within the

Appeal 2013-004839
Reexamination Control 95/000,384
Patent US 6,829,672 B1

external storage device." App. Br. 32-33. However, we agree with
Requester that Ban's disclosure that the USB flash device controller controls
the power of the flash memory module (Ban col. 6, ll. 51-52) does not
necessarily mean that the flash memory has its own power supply.
Moreover, and more important--and contrary to Patent Owner's arguments--
USB 1.1 cannot "teach away" from using DC power from the USB interface
because it *expressly discloses* that DC power can be supplied to the USB
device from the USB interface as part of *the USB specification itself. See
USB 1.1* at 134 *et seq.* (§ 7.2, Power Distribution).

### Claim 2

Patent Owner submits that claim 2 requires loading a driver of the
external storage device in the data processing system "for implementing
operation request" to the external storage device cooperating with the
firmware. App. Br. 37. "Thus, according to Claim 2, the driver being
loaded must be a driver for the specific external storage device and must be
able to implement operation request." *Id.* Patent Owner further alleges that
USB 1.1 describes a "generic" device driver that is not "driver specific" for
any device and "simply cannot implement any operation request." *Id.*

Requester responds that the driver being "specific" to the external
storage device is not required by the claim. Resp. Br. 19. Requester
continues:

> In any case . . . Ban discloses a driver specific for its external
> storage device that is used to implement read and write
> operation requests (*see, e.g.*, Col. 9, ll. 1-5 and 26-29) and *USB
> 1.1* provides the details of where such a driver is loaded in the
> data processing system (between the client layer/ "upper layer

Appeal 2013-004839
Reexamination Control 95/000,384
Patent US 6,829,672 B1

> operating system" and the USB bus interface/"lower layer
> operating system" such that software entities in the client layer
> can communicate with a USB device coupled to the host via the
> USB bus interface (*see, e.g.*, § 10.1.1).

Resp. Br. 19.

In response, Patent Owner again discusses USB 1.1 (Rebuttal Br. 18-19) but does not address the specific teachings relied upon in Ban. In particular, Ban describes the host platform uploading a USB client driver for the USB flash device, with the device drivers issuing read and write commands to the USB flash device with the application commands. Ban col. 9, ll. 1-29.

### Claim 4

Requester submits that each of Guide, Netac, FujiFilm, and RATOC teaches synchronously (i.e., when the USB device is plugged in) instructing the operating system to assign a drive symbol consistent with the requirements of claim 4. Resp. Br. 19-20. Patent Owner responds that none of these secondary references discloses symbol assignment for the external storage device as claimed. Rebuttal Br. 19. However, as noted *supra*, at least each of FujiFilm and RATOC demonstrates that it would have been obvious to assign and display a device symbol for the external storage device. FujiFilm 12; RATOC 25.

### Claim 5

We agree with Requester that Ban describes plug-and-play operation (col. 1, l. 62 - col. 2, l. 3) in more detail than does the '672 patent disclosure.

Appeal 2013-004839
Reexamination Control 95/000,384
Patent US 6,829,672 B1

Resp. Br. 20. We therefore disagree with Patent Owner (Rebuttal Br. 19) that the prior art fails to teach a driver for a USB external storage device with built-in flash memory that processes plug-and-play coordinating with the operating system. *See, e.g.*, Ban col. 1, l. 62 - col. 2, l. 3; col. 9, ll. 1-29.

### Claim 6

Patent Owner argues that Ban teaches read commands issued from a driver, but not from a user. App. Br. 39-40. However, Ban teaches emulating a disk drive. Ban col. 8, ll. 29-36. As we have previously noted, one of ordinary skill in the art would appreciate that the principal purpose of a disk drive is to store and retrieve data for applications in response to *user* commands, such as storing and retrieving a word processing document in disk memory.

Patent Owner also argues that Ban does not teach the driver converting the read command into a special read instruction that can be understood and executed by the firmware. App. Br. 39-40. However, while Ban might not use the word "converts" in describing the operation, the reference teaches converting read commands into special read instructions that can be understood and executed by the firmware, at least at column 9, lines 26 through 29 and column 10, lines 1 through 23.

### Claim 15

Patent Owner asserts that USB 1.1, sections 7.1.7.4 and 7.1.7.5, "do not disclose" how to implement "the suspend and resume functionality required by claim 15." App. Br. 40. Patent Owner admits, however, that the

Appeal 2013-004839
Reexamination Control 95/000,384
Patent US 6,829,672 B1

sections disclose how the USB standard interface supports suspend and
resume operations. *Id.* We agree with the Examiner and Requester that
USB 1.1 renders obvious, at the least, the functionality of "adopting" a
suspend/resume circuit consistent with the method of claim 15. The USB
1.1 disclosure indicates that suspend/resume circuits were readily available
to one of ordinary skill in the art and, at the least, suggests "adopting," as
claimed, a suspend/resume circuit in the external storage device.

*Claims 11-14*

Patent Owner argues that "each of Fujifilm, RATOC and Kikuchi
discloses a card reader and an indication relating only to the memory card
that is inserted into the card reader (not the operating state of the external
storage device as required by Claim 11)." App. Br. 43. The rejection,
however, relies on Kikuchi to show the use of an LED to indicate the
operating status of a storage device--the device in Kikuchi is an external
storage device when the memory card is installed. Resp. Br. 22.

Patent Owner further argues that claims 12 through 14 are patentable
because Kikuchi does not disclose an external storage device having a
"built-in" flash memory module. App Br. 43-44. However, the rejection
does not offer Kikuchi as teaching an external storage device having a
"built-in" flash memory module, because Ban does. *See* Ban, *e.g.*, Fig. 1.
Non-obviousness cannot be established by attacking references individually
where the rejection is based upon the teachings of a combination of
references. *In re Merck & Co.*, 800 F.2d at1097.

Appeal 2013-004839
Reexamination Control 95/000,384
Patent US 6,829,672 B1

*Claims 7-10*

The proposed rejection adds Gupta to the combination applied against claim 7, and claims 8 through 10 which depend therefrom.  Patent Owner has not shown that Gupta "teaches away" from the flash memory structure of the claimed invention being arranged on a block basis.  App. Br. 41.  Moreover, Patent Owner has not provided any reasoning or evidence to demonstrate that the "pages" described by Gupta might differ in substance from the "blocks" described by the '384 patent.  *See id.*

Patent Owner's remarks in support of dependent claims 8 through 10 consist of no more than statements of what the claims recite and assertions that the recitations are not found in the applied prior art.  Merely pointing out what a claim recites followed by a naked assertion that there is no corresponding step or structure in the references is not a substantive argument as to the separate patentability of the claims.  *See* 37 C.F.R. § 41.67(c)(1)(vii) ("A statement which merely points out what a claim recites will not be considered an argument for separate patentability of the claim.").  In particular, Patent Owner does not address the description (i.e., the factual basis) in the applied references (e.g., Gupta) upon which the original *inter partes* reexamination request relies.  *See* RAN 7.  *Cf. In re Lovin*, 652 F.3d 1349, 1357 (Fed. Cir. 2011) (reasonable to interpret Rule 41.37 to require more substantive arguments in an appeal brief than a mere recitation of the claim elements and a naked assertion that the corresponding elements were not found in the prior art).  Patent Owner thus has not provided substantive arguments for separate patentability with respect to any of claims 8 through 10.  Claims 8 through 10 thus stand or fall with claim 7.

Appeal 2013-004839
Reexamination Control 95/000,384
Patent US 6,829,672 B1

*Terasaki*

Figure 4 of Terasaki is reproduced below.



F I G . 4

Figure 4 is said to show a schematic structure of a PC card. Terasaki col. 6, ll. 21-22. The card 40 includes a PC card physical layer interface 42, a USB physical interface 43, a flash controller 46, and flash memory 41-1, 41-2, and 41-3. A USB line driver/receiver 44-1, an IDE (Integrated Device

Appeal 2013-004839
Reexamination Control 95/000,384
Patent US 6,829,672 B1

Electronics) command decoder 44-2 and an IDE host interface 44-3 are provided in the USB interface 44. The flash controller 46 is arranged between the flash memory, the PCMCIA ATA (Personal Computer Memory Card International Association AT Attachment) interface 45, and the IDE interface 47 by control signal lines C. *Id*. at col. 13, ll. 35-49. The PC card 40 can be operated as the IDE drive connected to the USB port of the desktop PC. *Id*. at col. 14, ll. 42-44.

Patent Owner submits that Terasaki "teaches away" from "directly accessing" the flash memory as claimed because Terasaki performs a USB-to-IDE communication protocol conversion "as disclaimed by Patent Owner." App. Br. 45. According to Patent Owner, "due to Patent Owner's prosecution history disclaimer," the claim term "directly accessing" means there is no communication protocol in the data accessing path. *Id*.

In particular, Patent Owner alleges that a reference was distinguished, during original prosecution, as failing to teach "directly accessing" data in the flash memory because it required a USB/ATA conversion. App. Br. 30. However, in this proceeding, the claims are amenable to amendment. We need not attempt to determine whether remarks that accompanied amendments during original prosecution rose to the level of clear disclaimer of subject matter, in a reexamination proceeding where the claims can be amended commensurate with the alleged disclaimer. Under the required broadest reasonable interpretation (BRI) standard, it is the *specification* that informs the scope of the claims. Claim language in the instant proceeding must be read in light of *the specification* as it would be interpreted by one of ordinary skill in the art. *In re Am. Acad. of Sci. Tech. Ctr.*, 367 F.3d 1359,

Appeal 2013-004839
Reexamination Control 95/000,384
Patent US 6,829,672 B1

1364 (Fed. Cir. 2004). The Office must apply the broadest reasonable meaning to the claim language, taking into account any definitions presented in *the specification. Id.* (citing *In re Bass*, 314 F.3d 575, 577 (Fed. Cir. 2002)). "During reexamination, as with original examination, the PTO must give claims their broadest reasonable construction consistent with *the specification.*" *In re ICON Health & Fitness, Inc.*, 496 F.3d 1374, 1379 (Fed. Cir. 2007) (citing *American Academy*, 367 F.3d at 1364) (emphasis added). When the claims can be amended, the *specification* outweighs remarks or actions made during prosecution. Patent Owner's briefs cite no case in which prosecution history disclaimer made a difference (i.e., narrowed the claims) when BRI was required. Further, Patent Owner's representative at the oral hearing could not identify such a case. *See* Oral Hearing Tr. at 38-39.

In this case, Patent Owner submits that the "without any protocol conversion" feature, which is not expressly recited in the claims, is described by the '672 patent disclosure at Figures 7 through 8 and column 5, lines 3 through 11. App. Br. 4. However, we find no discussion of protocol conversion in the relied-upon material and, certainly, no disclosure that there must be no protocol conversion when accessing flash memory. In fact, the specification elsewhere suggests that the "directly accessing" language of the claims refers to firmware "directly" controlling access of flash memory (col. 4, ll. 27-30; col. 10, l. 67 - col. 11, l. 3), in much the same way that flash controller 46 of Terasaki (Fig. 4) directly controls access to the flash memory by signals sent on control signal lines C.

Appeal 2013-004839
Reexamination Control 95/000,384
Patent US 6,829,672 B1

We agree with Requester that Patent Owner's additional arguments directed to the proposed rejections that include Terasaki are based on alleging individual deficiencies in Terasaki, rather than the applied teachings of the prior art.  Resp. Br. 24.

*Margalit*

Figure 1 of Margalit is reproduced below.

FIG. 1



Appeal 2013-004839
Reexamination Control 95/000,384
Patent US 6,829,672 B1

Figure 1 of Margalit is said to depict a USB key device with data storage capabilities. Margalit col. 2, ll. 34-36. The USB key device 10 includes a CPU 30, a USB interface device 40, firmware memory 50, RAM memory 60, and user data memory 70, which may comprise flash memory. *Id*. at ll. 37-56.

Patent Owner's additional arguments that are specific to the proposed rejections that include Margalit are based on an allegation that Margalit fails to incorporate-by-reference the USB 1.1 specification. App. Br. 49. We find Requester's position to be persuasive. Resp. Br. 24-25. Further, we agree with Requester that Patent Owner has submitted arguments that are not responsive to the rejections proposed, i.e., which presume that Margalit alone must teach the claimed subject matter. *Id.* at 25.

*Secondary Considerations*

Patent Owner's proffered evidence of commercial success consists of a Rule 132 declaration by Mr. Deng ("Deng Declaration II"; Ex. 14). Without any supporting evidence, the declaration alleges that Patent Owner's flash drives that "fall within the scope of the claims" commanded, roughly, one per cent of the relevant market. Deng Decl. II, ¶¶ 3, 6, 7; Resp. Br. 28.

Deng Declaration II also alleges (¶ 8) that USB flash memory drives sold by Patent Owner "and others" have achieved commercial success "because they include many beneficial features that result from the limitations that are recited in the claims of the '672 patent." As Respondent notes (Resp. Br. 28 n.15), the "others" are not identified. In any event, we

Appeal 2013-004839
Reexamination Control 95/000,384
Patent US 6,829,672 B1

do not credit the subjective belief of an interested party--a co-inventor and
Patent Owner's CEO--as to why purchasers might have bought USB flash
drives, absent supporting evidence consistent with the allegations. *See In re
Huang*, 100 F.3d 135, 140 (Fed. Cir. 1996) ("This merely represents the
inventor's opinion as to the purchaser's reason for buying the product, and,
alone, is insufficient.").

The Declaration also alleges that the '672 patent has been licensed to
other companies. Deng Decl. II, ¶ 9. However, the Declaration does not
refer to any supporting evidence. Moreover, the Declaration fails to provide
sufficient details of the licensing as to how it might relate to the merits of the
claimed invention of the '672 patent. *See Stratoflex, Inc. v. Aeroquip Corp.*,
713 F.2d 1530, 1539 (Fed. Cir. 1983) ("Aeroquip has shown neither a nexus
between the merits of the invention and the licenses of record, nor that those
licenses arose out of recognition and acceptance of the patent.").

Thus, we find that the evidence of non-obviousness proffered by
Patent Owner, even if it were presumed to establish commercial success,
fails to show sufficient nexus between the merits of the methods claimed in
the '672 patent and that commercial success.

*Summary/Conclusion*

In view of the foregoing, we find that the weight of the evidence, by a
preponderance, supports the Examiner's decision to enter and maintain each
of the § 103(a) rejections proposed by Requester.

Appeal 2013-004839
Reexamination Control 95/000,384
Patent US 6,829,672 B1

## DECISION

The Examiner's decision unfavorable to the patentability of claims 1-22 is affirmed.

Requests for extensions of time in this proceeding are governed by 37 C.F.R. §§ 1.956 and 41.79(e).

<u>AFFIRMED</u>

peb

Appeal 2013-004839
Reexamination Control 95/000,384
Patent US 6,829,672 B1


Patent Owner:

Xin "Kevin" He
TROUTMAN SANDERS LLP
THE CHRYSLER BUILDING
405 LEXINGTON AVENUE
NEW YORK, NY  10174


Third Party Requester:

Brian W. Oaks
BAKER BOTTS L.L.P.
PATENT DEPARTMENT
98 SAN JACINTO BLVD., SUITE 1500
AUSTIN, TX  78701-4039



U<small>NITED</small> S<small>TATES</small> P<small>ATENT AND</small> T<small>RADEMARK</small> O<small>FFICE</small>

**UNITED STATES DEPARTMENT OF COMMERCE**
**United States Patent and Trademark Office**
Address: COMMISSIONER FOR PATENTS
P.O. Box 1450
Alexandria, Virginia 22313-1450
www.uspto.gov

| APPLICATION NO. | FILING DATE | FIRST NAMED INVENTOR | ATTORNEY DOCKET NO. | CONFIRMATION NO. |
|---|---|---|---|---|
| 95/000,384 | 07/09/2008 | 6829672 | 00168.8002 | 4170 |

95483          7590          01/27/2015
Anova Law Group, PLLC
21351 Gentry Drive, Suite 150
Sterling, VA 20166

| EXAMINER |
|---|
| REICHLE, KARIN M |

| ART UNIT | PAPER NUMBER |
|---|---|
| 3992 | |

| MAIL DATE | DELIVERY MODE |
|---|---|
| 01/27/2015 | PAPER |

**Please find below and/or attached an Office communication concerning this application or proceeding.**

The time period for reply, if any, is set in the attached communication.

UNITED STATES PATENT AND TRADEMARK OFFICE

_____

BEFORE THE PATENT TRIAL AND APPEAL BOARD

_____

SANDISK CORPORATION
Requester and Respondent
v.

NETAC TECHNOLOGY CO., LTD.
Patent Owner and Appellant

_____

Appeal 2013-004839
Reexamination Control 95/000,384
Patent US 6,829,672 B1
Technology Center 3900

_____

Before HOWARD B. BLANKENSHIP, STANLEY M. WEINBERG, and
JOHN A. EVANS, *Administrative Patent Judges.*

BLANKENSHIP, *Administrative Patent Judge.*

DECISION ON REQUEST FOR REHEARING

INTRODUCTION

Patent Owner has filed a request for rehearing ("Request" or "Req.
Reh'g," Jan. 28, 2014) as provided by 37 C.F.R. § 41.79(a)(1)).  Patent

Appeal 2013-004839
Reexamination Control 95/000,384
Patent US 6,829,672 B1

Owner contends we erred in the Decision on Appeal entered December 31,
2013 ("Decision"), in which we affirmed the Examiner's decision
unfavorable to the patentability of claims 1–22.  Requester has submitted
comments in opposition to Patent Owner's request for rehearing (37 C.F.R.
§ 41.79(c)).


DISCUSSION

37 C.F.R. § 41.79 provides in pertinent part:

>    (b)(1) The request for rehearing must state with
> particularity the points believed to have been misapprehended
> or overlooked in rendering the Board's opinion reflecting its
> decision.  Arguments not raised in the briefs before the Board
> and evidence not previously relied upon in the briefs are not
> permitted in the request for rehearing except as permitted by
> paragraphs (b)(2) and (b)(3) of this section.

>    (2) Upon a showing of good cause, appellant and/or
> respondent may present a new argument based upon a recent
> relevant decision of either the Board or a Federal Court.

>    (3) New arguments responding to a new ground of
> rejection made pursuant to § 41.77 (b) are permitted.

*The Alleged "New Grounds of Rejection" in the Decision*

Patent Owner alleges that our discussion concerning Satore at
pages 16 and 17 of the Decision sets forth a new ground of rejection.  Req.
Reh'g 6.  As clearly stated in the Decision, however, our discussion was
responsive to Patent Owner's arguments in the Appeal Brief and in
particular to Patent Owner's proffered reasoning as to how it deems Sartore
to "teach away" from the invention.  *See* Decision 16–17; App. Br. 53.

Appeal 2013-004839
Reexamination Control 95/000,384
Patent US 6,829,672 B1

Patent Owner alleges further that our discussion of Ban II at page 20 of the Decision amounts to a new ground of rejection. Req. Reh'g 7. Again, however, our discussion was responsive to arguments made by Patent Owner in the Appeal Brief. In particular, under the heading containing the claim language "processing the operation request in magnetic disk format issued from users," Patent Owner argued that neither Terasaki nor Ban II discloses how to process requests from the "user" in magnetic disk format. App. Br. 47. We found the argument to be not persuasive. Decision 20.

Finally, Patent Owner alleges that the Decision contained a new ground of rejection by referring to FujiFilm and RATOC as teaching the claimed "data processing system assigning and displaying a device symbol for said external storage device" Req. Reh'g 9; Decision 18. However, the finding with regard to FujiFilm and RATOC was adopted by the Examiner and thus was not a new ground of rejection in the Decision. *See* Requester's Written Comments filed December 15, 2009 at 59 (adopted by the Examiner in the Action Closing Prosecution (1/13/2010) at 5) and Requester's Written Comments filed April 13, 2010 at 38 (incorporated by reference in the Examiner's Right of Appeal Notice (9/7/2010) at 17).

### *The New Arguments in the Request for Rehearing*

We have not considered the numerous new arguments that Patent Owner raises in the Request. Patent Owner does not point to where the arguments were raised in the briefs (Appeal Brief and Rebuttal Brief). Nor do we find sufficient basis in the briefs for the arguments now raised. Further, we have not considered the arguments in the Request that are based

Appeal 2013-004839
Reexamination Control 95/000,384
Patent US 6,829,672 B1

on evidence that is not properly before us. The "supplemental" declarations
filed after the close of prosecution were not considered by the Examiner.
The Examiner's decision not to consider that evidence is a procedural matter
not subject to appeal in this proceeding. Decision 21– 24.

*The Request for Clarification*

Patent Owner requests that we "clarify" our reference to Respondent's
Brief at page 11 of the Decision. Req. Reh'g 25. We reiterate that we
considered all the arguments and the evidence that were properly presented
in Patent Owner's Appeal Brief and Rebuttal Brief. We found Requester's
response in the Respondent Brief to be the more persuasive.

DECISION

We have granted Patent Owner's request for rehearing to the extent
that we have reconsidered our decision affirming the Examiner's decision
unfavorable to the patentability of claims 1–22, but we decline to modify our
decision in any way.

Pursuant to 37 C.F.R. § 41.79(d), this decision is final for the purpose
of judicial review. A party seeking judicial review must timely serve notice
on the Director of the United States Patent and Trademark Office. *See*
37 C.F.R. §§ 90.1 and 1.983.

<u>DENIED</u>

Appeal 2013-004839
Reexamination Control 95/000,384
Patent US 6,829,672 B1

Patent Owner:

Troutman Sanders, LLP
The Chrysler Building
405 Lexington Avenue
New York, NY 10174

Third Party Requester:

Baker Botts, LLP
Patent Department
98 San Jacinto Blvd.
Suite 1500
Austin, TX 78701-4039

ORIGINAL

RECEIPT FOR PAYMENT

# United States Court of Appeals
# For The Federal Circuit

OFFICE OF THE CLERK

Received From ___Anova Law Group, PLLC___
(NAME)

___Vienna, VA___
(ADDRESS)

## NON-APPROPRIATED ACCOUNT

4/1/15
(DATE)

| | AMOUNT |
|---|---|
| Admission Fee | |
| Filing Fee 95/000,384 | 500 00 |
| | |
| Duplicate Cert. of Admission | |
| | |
| | |
| | |
| | |
| | |
| | |
| TOTAL | 500 00 |

Clerk ☐

Deputy Clerk ☑ gv 57348

☐

| Cash ☐ | Check ☑ | MONEY ORDER ☐ |
|---|---|---|

29585        1581

## CERTIFICATE OF FILING AND SERVICE

I hereby certify that, on this the 6th day of July, 2015, I electronically filed the foregoing Brief of Appellant with the Clerk of Court using the CM/ECF System, which will send notice of such filing to all registered users.

I further certify that, upon acceptance and request from the Court, the required paper copies of the foregoing will be deposited with United Parcel Service for delivery to the Clerk, UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT, 717 Madison Place, N.W., Washington, D.C. 20439.

The necessary filing and service were performed in accordance with the instructions given to me by counsel in this case.

/s/ Shelly N. Gannon
Shelly N. Gannon
GIBSON MOORE APPELLATE SERVICES
421 East Franklin Street, Suite 230
Richmond, VA 23219

**CERTIFICATE OF COMPLIANCE**
**With Type-Volume Limitation, Typeface Requirements,**
**and Type Style Requirements**

1.      This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because:

        this brief contains <u>9,126</u> words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2.      This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because:

        this brief has been prepared in a proportionally spaced typeface using <u>Microsoft Word</u> in <u>14 Times New Roman</u>.

Dated: July 6, 2015                 <u>/s/ Xiaoqun Wu</u>
                                    Xiaoqun Wu